**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Miguel VALENZUELA, Defendant–Appellant.**

No. 02–2216.

United States Court of Appeals,
Sixth Circuit.

Feb. 27, 2004.

Kathleen Moro Nesi, Asst. U.S. Attorney, U.S. Attorney's Office, Detroit, MI, for Plaintiff–Appellee.

Richard P. Zipser, Southfield, MI, for Defendant–Appellant.

Before DAUGHTREY and COLE, Circuit Judges, and POLSTER,* District Judge.

PER CURIAM.

The defendant, Miguel Valenzuela, was convicted of conspiracy to possess with intent to distribute more than 1,000 kilograms of marijuana and sentenced to 168 months in prison. He now appeals, contending that the evidence adduced at trial was not sufficient to support his conviction and that the district judge erred in admitting hearsay testimony into evidence. We find no reversible error and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Following his arrest on drug-trafficking charges, James McManigal agreed to cooperate with law enforcement authorities in their investigation into the activities of McManigal's friends and business partners in a drug-distribution ring operating in eastern Michigan. Under the terms of the agreement, McManigal wore a recording and transmitting device while engaged in drug deals and discussions with the defendant and other individuals. Prior to Valenzuela's trial in this matter, however, McManigal committed suicide and thus was unavailable to testify regarding those transactions. Instead, Anthony Carter, an agent with the Drug Enforcement Administration, introduced the tape recordings at trial and explained the relevance of the discussions preserved on them.

Specifically, Carter noted that the tape recordings indicated that McManigal and Valenzuela met at least four times during May 2001. During those meetings, the men discussed marijuana sales, and Valenzuela gave McManigal $56,000 that Valenzuela had obtained from selling large quantities of the illegal drug. Carter further explained in his testimony that the marijuana that McManigal had given to the defendant to sell had been delivered to Valenzuela well before the date on which McManigal began serving as a confidential information for the government.

Other trial testimony elicited by the prosecution established that Valenzuela had sold marijuana for Eduardo Rodriguez for a number of years, buying 20—100 pounds of the contraband at a time and then repaying Rodriguez after selling the drug at prices ranging from $1,300 to $1,600 per pound. The defendant also procured drivers for Rodriguez to transport marijuana shipments from Arizona to Michigan. In addition, after the drugs reached the Detroit area. Valenzuela would arrange to store the marijuana until it could be sold or redistributed to other sellers within the organization. In fact. Rodriguez himself testified that the defendant was responsible for convincing Christoff Stevenson to drive a motor home filled with 813.7 pounds, or approximately 370 kilograms, of marijuana from Arizona to Michigan in February 2001. Unfortunately for Stevenson and for the other mem-

---

* The Hon. Dan Aaron Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

bers of the conspiracy. however, the driver was detained in Texas and the shipment never reached its destination.

To make up for the shipment confiscated in Texas, as well as for a second shipment of 880 pounds, or 400 kilograms, intercepted by agents in Arizona in late February 2001, Rodriguez arranged for the delivery in June 2001 of a shipment of approximately 3.000 pounds of marijuana. According to Rodriguez, Valenzuela was to receive 500 pounds (approximately 227 kilograms) from the shipment to sell. while the rest of the marijuana, minus relatively small amounts used to pay other individuals for services rendered. was to be stored in secret locations. Again, Valenzuela arranged for the storage, first with "an associate," then with an individual named "White Ray," and, finally, in a trailer rented to Rodriguez that was parked in a lot at a local business. When that trailer was finally located and opened by drug interdiction officers, the authorities recovered approximately 1,742 pounds, or 792 kilograms, of marijuana from it.

Valenzuela testified at trial in his own defense. He did not deny that one of the voices on the tape recordings was his but, rather, attempted to persuade the jury that his drug conversations with McManigal were aberrational, resulting from a one-time agreement with the informant. The defendant insisted that he was not routinely involved in drug-trafficking, but that McManigal had come to him, told him of his severe financial difficulties, and asked Valenzuela to help him out by selling 40 pounds of marijuana to raise money to hire legal counsel. The defendant claimed never to have sold marijuana prior to April 2001 but admitted that he helped arrange for storage for Rodriguez, that he knew Rodriguez was secreting marijuana, and that he paid Christoff Stevenson $9,000 on behalf of Rodriguez and McManigal to compensate Stevenson for driving a shipment of marijuana from Arizona to Michigan. Valenzuela further asserted that the large amounts of cash recovered from his home (totaling some $50,000) were not drug proceeds but winnings from his successful encounters with the slot machines at nearby casinos.

The jury chose not to accredit the testimony of the defendant, however, and convicted him of conspiracy to possess with intent to distribute more than 1,000 kilograms of marijuana. The district judge then sentenced Valenzuela to 168 months in prison and five additional years on supervised release.

### *DISCUSSION*

### I. Challenges to the Sufficiency of the Evidence

■ On appeal, Valenzuela first raises challenges to the sufficiency of the evidence used to convict him of the conspiracy charge. Specifically, he contends that the trial testimony shows only that he was engaged in buyer-seller transactions that cannot form the basis for conspiracy convictions. He further maintains that, even if a conspiracy is shown, the agreement involved only the 40 pounds of marijuana given to the defendant by McManigal. Finally, he asserts that his involvement with that 40 pounds of marijuana was precipitated only through entrapment by government agents.

Ordinarily, in analyzing any challenge to the sufficiency of the evidence. we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In doing so, moreover, we do not re-weigh the evidence, re-evaluate the credibility of witnesses, or substitute our

judgment for that of the jury. *See United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir.1993). However, when a defendant fails to make a timely motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, as happened in this case, "appellate review is limited to determining whether there was a manifest miscarriage of justice[, which] exists only if the record is devoid of evidence pointing to guilt." *United States v. Price*, 134 F.3d 340, 350 (6th Cir.1998) (internal quotation marks and citations omitted).

No such miscarriage of justice occurred in this case. Valenzuela does not deny that a drug-trafficking conspiracy involving Rodriguez and McManigal existed. Although he claims that he was not a participant in that conspiracy, the record is replete with testimony regarding his drug sales and his efforts to advance the purposes of the conspiracy both by procuring drivers to transport the marijuana from Arizona to Michigan and by arranging storage of the shipments upon their arrival. Furthermore, the trial testimony established the defendant's connection with at least 1,000 kilograms of marijuana, not just with the 40 pounds Valenzuela claims that he sold only to help out a friend in need. Indeed, the 3,000–pound shipment in June 2001 alone exceeded the charged 1,000–kilogram amount, without any reference to the defendant's involvement with numerous other large marijuana shipments and with other marijuana sales on Rodriguez's behalf. Hence, the record is clearly not devoid of evidence of Valenzuela's guilt of conspiring with Rodriguez and others to possess with intent to distribute more than 1,000 kilograms (or 2,200 pounds) of marijuana.

In another challenge to the sufficiency of the evidence, the defendant argues that the 40 pounds of marijuana he sold for McManigal cannot be considered in establishing the elements of the charged offense. In support of this contention, Valenzuela notes that McManigal had already been arrested by the time the defendant transferred the money to him from the sales, and it is legally impossible to conspire with someone operating at the direction of the government. Trial testimony indicated, however, that McManigal delivered the marijuana to Valenzuela and made the request to the defendant for assistance *prior to* McManigal's arrest by the authorities. In any event, even without the 40–pound sale, the evidence introduced by the government was more than sufficient to establish Valenzuela's connection with at least the 1,000 kilograms of marijuana necessary to support the defendant's conviction.

■ Finally, despite the defendant's assertions to the contrary, the trial evidence does not establish that government agents entrapped Valenzuela into committing the charged offense. As we recently reiterated in *United States v. Khalil*, 279 F.3d 358, 364 (6th Cir.2002), "[a] valid entrapment defense requires proof of two elements: (1) government inducement of the crime, and (2) lack of predisposition on the part of the defendant to engage in the criminal activity." Moreover, "[t]o be entitled to an entrapment instruction, the defendant must come forward with evidence to support both elements of the defense." *Id.* Here, even if we were to assume that Valenzuela could establish that the government. through McManigal, induced the defendant to engage in illegal activities. Valenzuela could not satisfy his additional burden of showing a lack of predisposition on his part to engage in the crime, especially given his prior and subsequent involvements with the Rodriguez marijuana distribution operation. Again, moreover, even if the 40–pound sale of marijuana to assist McManigal is discounted, evidence of the defendant's non-coerced activities in

furtherance of other conspiratorial acts is sufficient to support the conviction returned in this matter. All of Valenzuela's challenges to the legal sufficiency of the evidence offered against him are thus without merit.

## II. Challenge to the Introduction of Portions of the Tape–Recorded Evidence

 The defendant's remaining contentions of error involve the admission into evidence of certain portions of the tape recordings made of James McManigal's dealings with Valenzuela and Rodriguez prior to the confidential informant's suicide. The defendant contends that, because of McManigal's death and inability to testify at trial, McManigal's recorded statements are hearsay declarations that do not properly fall within any recognized exception to the rule barring admission of such evidence. As recognized by the district judge, however, the comments made by McManigal on the various tapes were not offered to prove the truth of the matters asserted in those statements. Instead, McManigal's conversations were included in the materials submitted to the jury only to provide context for the damning admissions made by the defendant and by his co-conspirator, Rodriguez, in the recordings. The challenged statements, therefore, are not hearsay and were properly admitted into evidence at trial. *See* Fed.R.Evid. 801(c).

Additionally, Valenzuela claims on appeal that the district court inadequately instructed the jury regarding the use that could be made of McManigal's tape-recorded statements. At the request of the prosecutor, the district judge instructed the jurors that they were not to treat the informant's recorded conversation as they would other trial testimony. The court cautioned:

> Ladies and gentlemen, since the party's no longer available for purposes of cross-examination by the defense or even direct examination by the Government that the substance of the deceased's conversation is only to put into context the rest of the conversation. It's not evidence in this matter in relation to what is actually said. Please consider that too, and consider the reason because they're not here so nobody can challenge whether it be the Government or the defense what they have to say. So it's only for purposes of context rather than anything else.

The defendant registered no objection to this limiting instruction and failed to suggest any alternative language. Under such circumstances, we conclude that the district court did not err in giving the quoted instruction.

### *CONCLUSION*

For the reasons set out above, we AFFIRM the judgment of the district court.