**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0311n.06

No. 09-5418

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**May 12, 2011**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| RAYMOND LEARY, | ) | |
| | ) | |
| **Defendant-Appellant.** | ) | **O P I N I O N** |
| _____ | ) | |

**Before: MOORE and STRANCH, Circuit Judges; COHN, District Judge.**[*]

**KAREN NELSON MOORE, Circuit Judge.** The defendant-appellant in this case, Raymond Leary, was arrested on May 15, 2008, after the police found three guns and 3.48 grams of crack cocaine in the apartment he shared with Betty Jo Luhman. Leary was charged with five counts related to his possession of the drugs and guns, and, after the jury heard evidence regarding the location in which the guns and drugs were found, along with several admissions from Leary to the arresting officers and testimony from a government expert on drug trafficking, the jury convicted Leary on all counts. During trial, however, Leary moved for a judgment of acquittal on the grounds that there was insufficient evidence to permit a jury to find that he constructively possessed the drugs and that he constructively possessed the guns in furtherance of a drug trafficking crime. He now

_____

[*]The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

appeals the district court's denial of those two motions.  For the following reasons, we affirm in part

and reverse in part.

## I.  BACKGROUND

Raymond Leary met Betty Jo Luhman in February 2006 and developed a romantic

relationship with her shortly thereafter.  By August 2006, he had moved into her apartment on the

east side of Lexington, Kentucky, but their relationship ended some time later because of an act of

domestic violence by Leary, for which he served 12 months in prison.  Leary and Luhman kept in

touch while he was in prison, however, and upon his release, they resumed their relationship.  Leary

moved back in with Luhman in April 2008.

Luhman's second-floor apartment had a living room, a kitchen, and one bedroom, with a

large, walk-in closet.  Leary and Luhman shared this closet; Luhman kept her clothes and jewelry

on the right side of the closet, and Leary kept his belongings on the left, including a few baseball hats

on a shelf at shoulder-level.  In addition, although Leary and Luhman were the primary occupants

of the apartment, during the time when the key events in this case took place—April and May of

2008—two other individuals were frequently at the apartment.  The first was Reginald Branch, a

friend of Leary's.  The second was Leary's cousin, Aaron Rankins, who went by the name of "Easy"

and who began to stay at the apartment in mid-April after being picked up from Edenton, North

Carolina, by Leary, Branch, and Brittany Stephens.  At trial, Stephens testified that when she picked

Easy up in Edenton with Leary and Branch, Easy brought a long, blue duffel bag with him into her

car, but she didn't know what was in the bag, nor did she see it after this trip.

Also in mid-April, Leary and Luhman got into an argument, during which Leary took a small, black gun out of the ceiling and pointed it at Luhman's head. Because Luhman had seen and perhaps said something about the lack of ammunition in the gun, Leary went into the closet and took a long, assault-rifle out of a duffel bag in the left side of the closet—this one clearly loaded —and pointed it at her head. Greatly scared by this, Luhman went to Richmond, Kentucky the next day to stay with her husband, from whom she had separated.

Luhman returned to Lexington by the end of April, but a similar event occurred a few weeks later. On May 14, 2008, Luhman saw Leary in her car with another woman, which prompted an argument between them. This time, Leary hit Luhman, and when Luhman indicated that she was going to go to the police, Leary grabbed her and stopped her from going. Leary then left in Luhman's car. The following day, May 15, Luhman called her cousin to pick her up and take her to the police. Her desire was to get the guns out of her apartment. After reporting to a deputy at the police station what Leary had done the previous day, Luhman went back to her apartment, where she was met by several officers in front of her apartment building. She told them that Leary had threatened her and that he had put a gun to her head the day before. While she was speaking to the officers, however, Leary called Luhman on her cell phone and threatened her; one of the officers could overhear Leary telling Luhman, "I can see the police outside and I'm gonna beat your ass later." R. 55–56 (Trial Tr. at 58).

The officers looked for Luhman's car and wondered where Leary could be if he could see them, but when they couldn't find Leary, they "finally just decided to go to the apartment to see if

3

Mr. Leary was there." *Id.* Leary met them at the door and complied with the officers' request to step outside, as did Branch and Easy, who were also in the apartment. Officer Justin Burnett spoke with Leary outside, while Officer Nathaniel Muller went inside the apartment with Luhman to look around. Leary received so many cell phone calls that the police had to tell him to stay off the phone so they could talk to him. Inside the apartment, Luhman showed Officer Muller where the guns were in the closet. When Officer Muller saw that the closet appeared to be shared by both Luhman and Leary, he opted to go back outside to speak with Officer Burnett rather than go through what appeared to be Leary's belongings. Officer Burnett asked Leary if he would permit them to search the closet, including, specifically, the clothes and duffel bag on the left side, and Leary gave them his permission. When the officers asked to whom the clothing and other items belonged, including the duffel bags, the colors of which they described, Leary stated that these items were all his. With that, the officers went back inside and searched the closet. In the blue duffel bag were three firearms: a black, Jennings .22 handgun; an AK-47 assault rifle, and an SKS assault rifle. Underneath the hats on the shelf was a bag of crack cocaine; the cocaine was broken up into several pieces. Nothing else of significance was found. Notably, the officers found no paraphernalia indicative of the use of drugs.

Leary was then arrested. He had $448—made up of twenty $20 bills, two $10 bills, two $5 bills, and eighteen $1 bills—plus a black cell phone, which rang frequently while the police were around Leary, on his person. Leary called Luhman on May 15 and told her to say the guns were hers. He was indicted in federal court on October 16, 2008, and charged with:

**Count 1:**        Possession with intent to distribute cocaine base (21 U.S.C. § 841(a)(1));

**Count 2:**        Possession of firearms in furtherance of a drug trafficking crime (18 U.S.C. § 924(c)(1)(A)(i));

**Count 3:**        Possession of firearms by a convicted felon (18 U.S.C. §§ 922(g)(1) and 924(a)(2));

**Count 4:**        Possession of firearms while subject to a domestic violence order (18 U.S.C. §§ 922(g)(8) and 924(a)(2));

**Count 5:**        Possession of firearms after having been convicted of a misdemeanor crime of domestic violence (18 U.S.C. §§ 922(g)(9) and 924(a)(2)).

R. 1 (Indictment). His trial occurred on December 29 and 30, 2008. At trial, Leary stipulated to the fact that (1) the substance found in the bag under the hats was 3.48 grams of cocaine base, (2) he had previously been convicted of a felony, (3) he was subject to a domestic violence order on the night of his arrest, (4) he had previously been convicted of a misdemeanor crime of domestic violence, and (5) the guns and ammunition listed in the indictment had been shipped or transported in interstate or foreign commerce prior to Leary's arrest. Appendix at 1–2.

The government presented the testimony of Luhman, Officer Burnett, Officer Muller, and Officer Thomas Perkins, who assisted with the search and arrest on May 15, 2008. In addition to the above facts, Luhman testified that she had seen Leary with drugs in the past, but she had never seen him use or sell them. She never knew him to have a job, and she said that Easy also kept some of his belongings in the closet. The government called Shane Ensminger as an expert in drug crimes. He testified that the amount of drugs found—3.48 grams—and the presence of guns were both

indicative of an intent to distribute the drugs, as opposed to mere personal use, which would instead likely result in the presence of drug-use paraphernalia. Leary, in turn, had only one witness testify: Brittany Stephens testified as to her involvement picking up Easy in North Carolina with Leary and Branch, and that Easy had brought a blue duffel bag with him, the contents of which she did not know.

At the close of the government's case, Leary moved for a judgment of acquittal. The district court denied this motion; after Leary presented his own case, the jury found him guilty on all counts. He received a sentence of 100 months in prison for Count 1, to run concurrently with the 100-month sentences he received for Counts 3, 4, and 5, and a sentence of 60 months for Count 2—to run consecutively to the others—bringing the total sentence to 160 months in prison. R. 42 (Judgment at 2). Leary also received a five-year term of supervised release. Leary appeals the denial of his motion for a judgment of acquittal.

## II. ANALYSIS

We review the denial of a motion for a judgment of acquittal de novo, "'but [we] affirm[] the decision if the evidence, viewed in the light most favorable to the government, would allow a rational trier of fact to find the defendant guilty beyond a reasonable doubt.'" *United States v. Burchard*, 580 F.3d 341, 352 (6th Cir. 2009) (quoting *United States v. Solorio*, 337 F.3d 580, 588 (6th Cir. 2003)). "[We] will not substitute [our] judgment for that of the jury." *Id.* "'A defendant claiming insufficiency of the evidence bears a very heavy burden. Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis

except that of guilt.'" *United States v. Fortson*, 194 F.3d 730, 735 (6th Cir. 1999) (quoting *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986)).[1]

Leary focuses his arguments on two main points. First he argues that there was insufficient evidence to prove that he possessed the drugs with intent to distribute, and second he contends that there was insufficient evidence to prove that he possessed the guns in the blue duffel bag in furtherance of a drug trafficking crime. Under his theory, insufficient evidence of drug possession would necessarily require the reversal of his convictions on Counts 1 and 2, and insufficient evidence of gun possession would necessarily require the reversal of his convictions on Counts 2, 3, 4, and 5.

## A. Possession Of The Drugs

"To sustain the charge of possession with intent to distribute, the government was required to prove beyond a reasonable doubt that on or about [May 15, 2008, Leary] (1) knowingly; (2) possessed a controlled substance; (3) with intent to distribute." *United States v. McGee*, 529 F.3d 691, 696 (6th Cir. 2008) (internal quotation marks omitted). Leary argues that there was insufficient evidence to prove that he was "trafficking or was possessing the drugs with the intent to traffic,"

---

[1]When a defendant who makes a motion for a judgment of acquittal at the close of the government's case fails to renew that motion at the close of all the evidence, we ordinarily review for "manifest miscarriage of justice." *United States v. Rodriguez*, 882 F.2d 1059, 1063 (6th Cir. 1989). The government, however, has not raised this argument on appeal, and instead argues that our review is de novo, thereby waiving any objection to the application of the ordinary standard of review. *See United States v. Tosh*, 330 F.3d 836, 840 n.4 (6th Cir. 2003) (deeming an argument not made by the government on appeal to have been waived); FED. R. APP. P. 28(b) (stating the requirements of appellee's brief and noting that "the statement of the standard of review" need not appear "unless the appellee is dissatisfied with the appellant's statement").

taking issue with the government's use of Shane Ensminger in particular. Leary Brief at 20. To support his arguments Leary points out that Easy and Branch both had access to the closet, and Easy even kept some of his belongings there. Leary also observes that Ensminger had no personal knowledge of the facts of Leary's case and that there were "no indications of paraphernalia, no smells, no cooking materials, no scales, no notebooks, no anything other than the simple existence of 4 grams of rock cocaine in a closet shared by at least 2 people and used by 3 or 4." *Id.* at 21. We do not believe there is merit in these arguments.

"A conviction for possessing a controlled substance with intent to distribute can be based upon a showing of actual or constructive possession." *United States v. Hill*, 142 F.3d 305, 312 (6th Cir. 1998). "Constructive possession requires evidence supporting the conclusion that the defendant had the ability to exercise knowing dominion and control over the items in question." *United States v. Wettstain*, 618 F.3d 577, 586 (6th Cir. 2010) (internal quotation marks omitted). The ability to exercise dominion and control over the drugs can be direct or through others. *United States v. Cobbs*, 233 F. App'x 524, 534 (6th Cir. 2007). Furthermore, this element may be established by evidence showing Leary's proximity to the drugs combined with some other evidence—a specific nexus—linking him to the drugs. *See, e.g.*, *id.* ("While mere proximity to the drugs is not sufficient, proximity combined with other evidence of the defendant's involvement in a conspiracy to distribute crack cocaine will suffice to establish possession."). Additionally, we have emphasized that constructive possession requires a specific intent, *see United States v. Bailey*, 553 F.3d 940, 945 (6th Cir. 2009); a defendant must "'*knowingly* ha[ve] the power and the *intention* at a given time to

exercise dominion and control over an object, either directly or through others,'" *United States v. Hadley*, 431 F.3d 484, 507 (6th Cir. 2005) (emphasis added) (quoting *United States v. Kincade*, 145 F.3d 771, 782 (6th Cir. 1998)); *United States v. Newsom*, 452 F.3d 593, 606 (6th Cir. 2006). Proof that one knowingly and intentionally has dominion over the *premises* where the contraband is found "is sufficient to establish constructive possession." *Kincaide*, 145 F.3d at 782.

Here, there is sufficient circumstantial evidence to permit a reasonable jury to find that Leary constructively possessed the crack cocaine found in the closet. First, it is clear that Leary knowingly and intentionally exercised dominion over the premises because he and Luhman admitted that they both lived in the apartment, and he further admitted that he kept his possessions on the left side of the walk-in closet. The drugs were also found on his side of the closet, underneath his hats. Officers Burnett and Muller both testified that Leary admitted that the hats, along with the men's clothing and the duffel bags on that side of the closet, were his. In addition, Luhman testified that she had seen Leary in the past with crack cocaine in a small, plastic bag, just as it was found here. This is sufficient to establish that Leary had the "ability to exercise knowing 'dominion and control'" over the drugs. *Wettstain*, 618 F.3d at 586 (internal quotation marks omitted); *Cobbs*, 233 F. App'x at 534. Furthermore, although it is clear that others, namely Easy and Branch, had access to the closet and could have possessed the drugs, the focus of this inquiry is on whether the evidence, "'viewed in the light most favorable to the government, would allow a rational trier of fact to find the defendant guilty beyond a reasonable doubt.'" *Burchard*, 580 F.3d at 352 (quoting *Solorio*, 337 F.3d at 588). The evidence, we believe, meets this standard.

9

**B. Intent To Distribute**

With respect to the issue of Leary's intent to distribute the crack cocaine, a jury may infer an intent to distribute from "the quantity and manner of packaging of the drugs, and the presence of weapons and equipment (an electronic scale) for the sale of drugs." *United States v. Coffee*, 434 F.3d 887, 897 (6th Cir. 2006). Regarding the quantity of the drugs, it should be "'too large for personal use alone.'" *United States v. McCreary-Redd*, 475 F.3d 718, 724 n.8 (6th Cir. 2007) (quoting *United States v. Jackson*, 55 F.3d 1219, 1226 (6th Cir. 1995)). For example, the *McCreary-Redd* court noted that we have found an intent to distribute from "28 packages of marijuana, totaling 32 grams and eight individual bags of cocaine base, totaling 7.6 grams," *see Coffee*, 434 F.3d at 897, one kilogram of cocaine, *see United States v. Phibbs*, 999 F.2d 1053, 1065–66 (6th Cir.1993), and 123.6 grams of cocaine, *see United States v. Giles*, 536 F.2d 136, 141 (6th Cir.1976). *McCreary-Redd*, 475 F.3d at 724 n.8. Lastly, expert testimony may be used to provide evidence of an intent to distribute. *E.g.*, *United States v. Chavis*, 296 F.3d 450, 456 (6th Cir. 2002) (citing *United States v. Peters*, 15 F.3d 540, 544–45 (6th Cir. 1994)).

We believe that the evidence is sufficient to permit a reasonable jury to find beyond a reasonable doubt that Leary had an intent to distribute. The jury knew that Leary had possessed several grams of crack cocaine that were broken into several pieces and were kept in a small plastic bag. The jury heard Ensminger tell them that at that time, drug dealers in Lexington often sold pieces of crack cocaine out of one bag, rather than individually wrapping each rock for sale. Leary also had $448 in his possession when he was arrested, mostly in $20 bills; according to Ensminger,

because a rock costs about $20, street-level drug dealers often carry numerous $20 bills. Moreover, Luhman testified that in the time she lived with Leary, including the month or two right before his May 15, 2008 arrest, she had never seen him use drugs, nor had she known him to have any legitimate job. Finally, the jury knew that no paraphernalia associated with the use of crack cocaine was found in the apartment, which Ensminger stated supported an inference of possession with intent to distribute. We believe this evidence provides support for the jury's verdict.

Running slightly counter to this view, however, are several facts that a reasonable jury could view as indicating personal use, rather than an intent to distribute, or simply as holes in the prosecution's theory. First, the amount of drugs found, only 3.48 grams, is substantially smaller than the amounts involved in the cases cited in *McCreary-Redd*. Yet Ensminger viewed this amount as enough to indicate an intent to distribute. He noted, for example, that crack is commonly consumed on a per-rock basis, with a rock consisting of approximately 200 milligrams of crack cocaine. Three-and-a-half grams is commonly known as an "eight-ball" and can provide between fifteen and twenty rocks. On the other hand, Burnett admitted that an eight-ball can be sold to an individual user. These two pieces of testimony together demonstrate that Leary's possession of an eight-ball could indicate that he is either a user or a seller. Consequently, the amount of drugs found here does not provide a dispositive basis for a finding either in favor of or against an intent to distribute.

Second, officers found no paraphernalia indicative of the sale or distribution of drugs, such as scales or notebooks. This fact, however, does not prove that Leary did not intend to distribute the drugs; it is merely a piece of evidence that the jury did not find persuasive. Moreover, possession

11

of an eight-ball without any scales or notebooks could—as Ensminger testified—easily be taken as a sign that Leary was a low-level drug dealer, one who was at the bottom of the distribution chain but who was a drug dealer nonetheless.

Third, we have noted on numerous occasions that an intent to distribute can be seen where drugs are individually wrapped for sale, rather than grouped in one bag. *See, e.g.*, *United States v. Savoires*, 430 F.3d 376, 378, 382 (6th Cir. 2005); *United States v. Whitehead*, 415 F.3d 583, 589 (6th Cir. 2005); *United States v. Harris*, 192 F.3d 580, 583, 589 (6th Cir. 1999). These cases, of course, indicate that this would be an easier case if the pieces of crack cocaine here had been individually wrapped, but they do not establish that the lack of individual wrapping necessarily *precludes* a finding of an intent to distribute. Indeed, as mentioned above, Ensminger testified that drug dealers in Lexington at that time often kept multiple rocks in one bag and let the buyer pick the rock out of the bag—a "buyer's choice," of sorts.

Fourth, and lastly, the proximity of the guns to the drugs is used by the government to make a circular argument: that (1) the drugs must have been intended for distribution because they were found near the guns, and (2) the guns must have been intended to facilitate drug trafficking because they were found near the drugs. The circle is also drawn by case law. *Compare Coffee*, 434 F.3d at 897 (stating that finding guns near drugs can indicate that *the drugs* were intended for distribution), *with United States v. Mackey*, 265 F.3d 457, 460–61 (6th Cir. 2001) (stating that finding guns near drugs can indicate that *the guns* were intended to facilitate drug trafficking). We need not place any reliance on this argument, however, because the jury's finding of an intent to

distribute does not necessarily rest on the proximity of the guns to the drugs here. Rather, the evidence mentioned above supplies a sufficient basis for the jury's verdict, thereby warranting affirmance.

For these reasons, we believe that a reasonable jury could base a finding of intent to distribute on the evidence mentioned above, despite the other permissible interpretations available in this case. We therefore affirm Leary's conviction on Count 1.

## C. Possession Of The Guns

Regarding the gun charges, Leary appears to challenge the sufficiency of the evidence that he constructively possessed the guns found in the blue duffel bag. The law on constructive possession described above in relation to the possession of drugs also applies to the possession of firearms. The government must simply prove, using either direct or circumstantial evidence, that "the defendant had the ability to exercise knowing 'dominion and control' over the items in question." *Wettstain*, 618 F.3d at 586 (internal quotation marks omitted). Dominion and control over the premises where the item is found is acceptable, *see Kincaide*, 145 F.3d at 782, but where evidence of a defendant's mere presence near the guns is presented, there must also be some "'other incriminating evidence', coupled with presence, . . . [that] serve[s] to tip the scale in favor of sufficiency." *Bailey*, 553 F.3d at 947 (quoting *United States v. Arnold*, 486 F.3d 177, 183 (6th Cir. 2007) (en banc)) (alterations in original). *Bailey* and *Arnold* provide good examples for comparison to the present case. In *Bailey*, we found the mere fact that the defendant had been driving the car in which a gun was found without any other passengers to be insufficient to establish constructive

possession. 553 F.3d at 948–49. In *Arnold*, by contrast, the defendant had been sitting in the passenger's seat of a car, under which police found a gun, but there was also other evidence linking the defendant to that gun: a witness had called 9-1-1 shortly before the arrest to report that the defendant had just threatened her with a gun matching the description of the one found in the car. 486 F.3d at 181–82.

The evidence of constructive possession of firearms here is much more similar to the evidence in *Arnold*. Not only were the guns found in the closet—an area over which Leary exercised dominion and control, albeit shared—but Leary openly admitted that the blue duffel bag on the left side of the closet in which the guns were found was his, as were all of the other items on the left side of the closet. Furthermore, as in *Arnold*, Luhman had just reported to the police that Leary had pointed a small, black gun matching the description of one of the guns found in the blue duffel bag at her. She had also seen him take one of the assault rifles out of a duffel bag when he pointed a gun at her in mid-April. This evidence goes beyond that found to be sufficient in *Arnold*, thereby providing the district court with ample reason to deny Leary's motion for a judgment of acquittal.

We therefore affirm this portion of the district court's decision as it relates to Counts Two through Five.

**D. The "In Furtherance Of" Element**

With respect to the requirement in Count Two that Leary have possessed the guns "in furtherance of" a drug trafficking crime, we have held that "[t]he term 'furtherance' should be understood in its ordinary or natural meaning, which . . . is 'a helping forward: advancement,

promotion.' In other words, the weapon must promote or facilitate the crime." *Mackey*, 265 F.3d at 460–61 (internal citation omitted); *see also Cobbs*, 233 F. App'x at 535 ("A firearm is possessed 'in furtherance of' a drug trafficking offense if it advances, promotes or facilitates the crime."). "[T]he possession of a firearm on the same premises as a drug transaction would not, without a showing of a connection between the two, sustain a § 924(c) conviction." *Mackey*, 265 F.3d at 462. "By requiring that the possession be 'in furtherance of' the crime, Congress intended a specific nexus between the gun and the crime charged." *Id.* "In order for the possession to be in furtherance of a drug crime, the firearm must be strategically located so that it is quickly and easily available for use. . . . Other factors that may be relevant . . . include whether the gun was loaded, the type of weapon, the legality of its possession, the type of drug activity conducted, and the time and circumstances under which the firearm was found." *Id.* On the other hand, we have distinguished the "in furtherance of" prong from the "during and in relation to" prong also contained in § 924(c) by holding that the "in furtherance of" prong "requires the government to prove a defendant used the firearm with greater participation in the commission of the crime or that the firearm's presence in the vicinity of the crime was something more than mere chance or coincidence." *United States v. Combs*, 369 F.3d 925, 933 (6th Cir. 2004).

We believe that the evidence in this case is insufficient to permit a reasonable jury to find that Leary possessed the guns in the blue duffel bag "in furtherance of" drug trafficking. The strongest point in favor of such a finding is that the guns were in the closet where the drugs were found, but as *Mackey* makes clear, this proximity alone is not enough to establish that the guns were possessed

15

"in furtherance of" drug trafficking; there must be evidence tending to show "a connection between the two." *Mackey*, 265 F.3d at 462. The government argues that the presence of the guns in the closet with the drugs shows that the guns were "strategically located so that [they were] quickly and easily available for use," *id.*, but it cannot be true that any time a gun is found near drugs it is necessarily the result of a strategic decision relating to drug activity. Indeed, the guns and the drugs were found in a closet—a storage space, rather than a place from which drugs were sold. Acceptance of the government's argument would render meaningless the requirement that the government show that "a defendant used the firearm with greater participation in the commission of the crime or that the firearm's presence in the vicinity of the crime was something more than mere chance or coincidence." *Combs*, 369 F.3d at 933.

Furthermore, we cannot say that the *Mackey* factors permit a finding that the guns were possessed in furtherance of a drug trafficking crime. First, two of the guns in the blue duffel bag were unloaded. Additionally, "the type of drug activity conducted," *see Mackey*, 265 F.3d at 462, was not very substantial, with the amount of drugs involved—3.48 grams—being commonly in possession of both users and dealers. "[T]he time and circumstances in which the guns were found," *id.*, is also unhelpful. There is no evidence that any drug sales took place in Luhman's apartment, much less in the closet connected to the bedroom, nor was any drug manufacturing equipment found on the premises.

That leaves only "the type of weapon" and "the legality of its possession." With respect to the type of weapon, Ensminger testified that "[y]ou'll find firearms, handguns and regular guns more

16

commonly with a trafficker than you will a user," but this testimony helped to establish only that the presence of guns indicated that the drugs were intended for distribution, and that drug dealers often need to protect themselves from other drug dealers and those who seek the money that drug dealers usually keep in their possession. R. 55–56 (Trial Tr. 128–29). It does not establish a "specific nexus" between these guns and the small amount of drugs found here; instead, it establishes only a general one, suggesting that drug dealers *generally* possess guns for protection from drug users and other drug dealers, not that the guns in this case were possessed for such drug-dealing-related protection. *See United States v. Nance*, 40 F. App'x 59, 67 (6th Cir. 2002) (unpublished opinion) (holding that a drug-agent's testimony "that drug traffickers usually have guns to facilitate trafficking" does not establish "specific facts linking [the] guns to the drugs found on [the defendant's] person"). There was no testimony to illuminate for the jury whether these particular weapons were likely present to facilitate drug trafficking. Similarly, there was no testimony linking Leary's unlawful possession of these weapons to the "specific nexus" needed to prove the facilitation of drug trafficking.

In several of our prior cases, a "strategic[] locat[ion]" of a gun can be seen where the positioning and location of the gun is uniquely helpful to the defendant's desire potentially to use the guns to protect against drug-activity-related threats. *See, e.g.*, *United States v. Swafford*, 385 F.3d 1026, 1029 (6th Cir. 2004) (noting that "[t]he gun was found loaded, with its handle pointing up, within arm's reach of the bed where [the defendant] was lying"); *United States v. Paige*, 470 F.3d 603, 609–10 (6th Cir. 2006) (finding a "specific nexus" where "two loaded firearms were found

under a cushion and next to the couch in the duplex from which crack was being sold at all hours of the day and night and in which the officers found crack cocaine, $900 cash, and digital scales with cocaine residue"); *United States v. Lengen*, 245 F. App'x 426, 435–36 (6th Cir. 2007) (finding a "specific nexus" where one gun was found "in the headboard of defendant's bed, only three or four feet from the wall safe in which police found $25,000 in cash and a substantial amount of methamphetamine," and another was found "in a drawer in the defendant's office, either together with or very close to a supply of cocaine and other scheduled drugs"); *United States v. Ham*, 628 F.3d 801, 804, 808–09 (6th Cir. 2011) (finding a "specific nexus" where a loaded gun "was located about head-high on top of an armoire situated just outside the closet where the drugs were found" and in which the defendant was hiding when the police found him). A "specific nexus" can also be seen where the guns are simply located throughout the house, which may itself possibly be a strategic decision. *See, e.g.*, *United States v. Penney*, 576 F.3d 297, 315 (6th Cir. 2009) (finding a "specific nexus" where guns were "placed throughout [the defendant's] residence," with several weapons next to $1,300 in cash).

Beyond whether the guns were "strategically located," a "specific nexus" is sometimes seen where the premises in which the guns and drugs are found is one in which drugs are sold or manufactured, thereby enhancing the inference that guns found on that premises may be "in furtherance of" the drug activity; this is especially true where the house is used *only* for drug activity, and not as a residence. *See, e.g.*, *United States v. Whitehead*, 415 F.3d 583, 585–86, 589–90 (6th Cir. 2005) (finding a "specific nexus" where drugs were sold out of the house in which the gun was

18

found, the house was "unfit for habitation," and the defendant was found with drugs on his person); *Paige*, 470 F.3d at 609–10 (finding a "specific nexus" where "two loaded firearms were found under a cushion and next to the couch in the duplex from which crack was being sold at all hours of the day and night and in which the officers found crack cocaine, $900 cash, and digital scales with cocaine residue"); *United States v. Couch*, 367 F.3d 557, 561 (6th Cir. 2004) (finding a "specific nexus" where "a loaded assault rifle was in plain view at the location where the officers arrested [the defendant]," and "the police located an additional eleven guns in [the defendant's] garage—the area where [the defendant's] drug transactions were known to occur and where the officers located over 200 additional pills").

A "specific nexus" between guns and drugs located on the same premises can also be seen where there is evidence that the defendant had actual possession of a gun while committing a drug-trafficking crime. *See, e.g.*, *United States v. Street*, 614 F.3d 228, 236 (6th Cir. 2010) (finding a "specific nexus" where the defendant had the gun on his person while selling drugs); *United States v. Brooks*, No. 08-2514, 2010 WL 4781421, at *8 (6th Cir. Nov. 17, 2010) (unpublished opinion) (finding a "specific nexus" where the defendant had a gun on his person and others testified that the defendant carried a gun while selling drugs, and other guns were found on the premises at which drug activity took place). Additionally, a "specific nexus" can be seen in situations in which there is a large amount of drugs or money present, such that the very existence of these items on the premises may be seen to warrant a gun for protection. *See, e.g.*, *Penney*, 576 F.3d at 315 (noting that guns were found near $1,300 in cash); *Lengen*, 245 F. App'x at 435–36 (noting that guns were found

19

near "$25,000 in cash and a substantial amount of methamphetamine"). In all of these situations, the evidence permitted an inference that the guns must have been used to protect the defendant or otherwise to facilitate a drug crime.

Here, the trial evidence does not permit the same inference. The guns were found in a duffel bag in the closet, not on Leary's person or easily within his reach. There is no evidence that the sale or manufacture of drugs occurred within Luhman's apartment. There is no evidence that Leary possessed a gun any time that Luhman saw him with drugs, and the amount of drugs and cash here was relatively small. We are left, then, with nothing more than the fact that the guns were found in a duffel bag near a relatively small amount of drugs in an apartment in which multiple people lived and in which there is no other evidence indicating that the guns were possessed to facilitate or promote drug trafficking. In such circumstances, we cannot say that a reasonable jury could find that the "in furtherance of" element was proved beyond a reasonable doubt; there is no evidence that would meaningfully indicate that the guns were present to facilitate drug trafficking. We therefore reverse Leary's conviction on Count Two.

### III. CONCLUSION

For the reasons stated above, we **AFFIRM** Leary's convictions on Counts One, Three, Four, and Five, and we **REVERSE** Leary's conviction on Count Two. We **REMAND** for further proceedings in accordance with this opinion.