NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0851n.06

No. 13-5928

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Nov 13, 2014*
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF TENNESSEE |
| GUSTAVO GUADARRAMA, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

**BEFORE: COOK and WHITE, Circuit Judges; and MICHELSON, District Judge.**[*]

**MICHELSON, District Judge**. Law enforcement agents conducted several controlled drug buys involving Defendant Gustavo Guadarrama. A subsequent search of Guadarrama's apartment revealed large quantities of marijuana, cash, firearms and ammunition. A jury convicted Guadarrama of conspiracy to distribute marijuana and methamphetamine, possession with intent to distribute marijuana, and several firearm-related offenses. He now challenges the sufficiency of the evidence supporting all but the conspiracy-to-distribute-methamphetamine conviction. We AFFIRM.

**I.**

Because Guadarrama challenges the sufficiency of the evidence supporting his convictions, we describe the evidence presented at trial in some detail.

---

[*] The Honorable Laurie J. Michelson, United States District Judge for the Eastern District of Michigan, sitting by designation.

Law enforcement suspected Guadarrama and his brother, Alfredo, of selling methamphetamine in the Morristown, Tennessee area. The investigation, which began in February 2011, involved four controlled buys of methamphetamine through confidential informants. Two of the three confidential informants and the agents involved in the buys testified at trial.

The first two controlled buys occurred on February 1 and May 15, 2011, in the parking lot of Adriana's Video Store in Morristown, Tennessee. On both occasions, a confidential informant known as Alfredo Ramirez called Guadarrama's brother to request methamphetamine. But both times, Guadarrama, instead of his brother, came to the parking lot to make the sales. Ramirez wore a video camera during the May 15 buy. The tape was introduced into evidence and Ramirez identified Guadarrama as the seller at trial.

On May 23, 2011, two different confidential informants met with Guadarrama and another individual at Guadarrama's Jefferson City, Tennessee apartment. Only one of those informants, Rene Rosales, testified at trial. He testified that the informants negotiated a purchase of $300 worth of methamphetamine from "El Pelon" and another individual who he understood to be "Pelon's boss." He identified Guadarrama as "El Pelon" at trial. The second individual in the apartment was later identified as Fidel Salgado ("Flaco"), Guadarrama's suspected supplier (and eventual co-defendant.) Rosales wore a video recording device during the transaction and the video was played at trial.

Rosales made a final controlled buy on June 2, 2011. He met Guadarrama in a Big Lots parking lot in Jefferson City. Guadarrama brought him an ounce of methamphetamine and the two discussed a price for a future purchase of four ounces of methamphetamine. Rosales wore a video recording device during the encounter and the video was played at trial.

On April 4, 2012, officers executed an arrest warrant for Guadarrama at his apartment in Jefferson City. Agent Gregory Smith testified that the agents knocked at the door, gained access to the apartment, and encountered Guadarrama in the front room. The agents conducted a sweep of the residence and encountered "Bedroom Number 2," a locked room in the apartment. They asked for a key to the room, but because there was "no definitive answer as to where a key would be" or whether Guadarrama possessed one, Agent Smith breached the door to "clear" the room of any threats. When he entered the room, Agent Smith smelled marijuana. Another agent observed a "long gun" in the closet.

At this point, Guadarrama had been arrested and placed in the backseat of a patrol car. Agent Allen Pack and Agent Smith interviewed Guadarrama, in Spanish, inside the vehicle. Agent Pack advised Guadarrama of his Miranda rights by reading directly from a standard FBI form, written in Spanish, which Guadarrama signed. After speaking with Guadarrama for a few minutes, Agent Pack requested Guadarrama's consent to search his residence using another standard Spanish-language FBI form, which Guadarrama also signed. During the interview, Guadarrama said that he had entered the United States illegally and had been in the country for eight years.

Agent Pack specifically asked Guadarrama about Bedroom Number 2. Guadarrama said that the room had been rented out to a person named Felipe but that Felipe had not returned to the apartment for about a month. Prior to Felipe, the room belonged to Guadarrama's brother Alfredo. Guadarrama told Agent Pack that the room contained approximately thirty pounds of marijuana, a shotgun belonging to Alfredo, and a .25 caliber semi-automatic pistol belonging to Guadarrama. Guadarrama said that he had access to the room but that the marijuana belonged to Flaco and that Guadarrama was storing Flaco's marijuana in the apartment in exchange for help

with the bills. But Guadarrama admitted that he had occasionally sold small quantities of the marijuana himself.

After Guadarrama gave his consent to search his residence, a group of agents returned to the apartment. The agents testified regarding the search at trial, and the government also introduced several photos of Bedroom Number 2. The door to Bedroom Number 2 was already open due to the prior breach. Agents observed the "long gun," a Winchester Model 37A 20-gauge shotgun, as well as a handgun, a Raven Arms .25 caliber semi-automatic pistol. Both weapons were found in the closet, the shotgun standing up in the corner and the handgun on the top shelf. Neither gun was loaded, the closet contained ammunition for the handgun, and agents discovered shotgun shells in the kitchen. One agent testified that a handgun would be a "preferred weapon" if a person were to "use it to carry [] on their person during drug transactions."

Agents also found approximately sixty pounds of marijuana in Bedroom Number 2. The marijuana was compressed into bricks and packaged in "12 pack coke cartons, [an] herbal life box, a black duffle bag, . . . stuffed in a cooler, [and] some of it was broken out for resale in Ziploc baggies." Agent Todd Coleman testified that some of the marijuana was discovered "directly under the nightstand" along with a digital scale that would usually be used to measure out drug quantities. Finally, agents found a trash bag containing discarded shrink-wrapping that was consistent with the shrink-wrapping found on the marijuana bricks in the room. Agent Coleman analyzed the discarded wrappers in comparison to the bricks and concluded they had held approximately 195 pounds of marijuana.

The Agents also found a total of $12,000 in cash in Bedroom Number 2, of which $7,000 was found on the top shelf of the closet, next to the pistol. During the interview, Guadarrama said that $3,000 of that amount was his and that the rest belonged to Flaco.

## II.

On April 10, 2012, a Grand Jury returned an indictment against Guadarrama, Flaco, and Chon Ortiz, charging numerous conspiracy, drug, and firearm-related offenses.

A jury trial commenced on June 20, 2012. At the close of the government's case-in-chief, Guadarrama moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. He argued that the evidence had not "established . . . that a conspiracy exists as it relates to the marijuana and the methamphetamine" and that the evidence did not "create that nexus that these guns were used in the furtherance of a drug trafficking offense." The district court denied the motion, noting that although Guadarrama had "phrase[d] his motion as a Rule 29 motion directed to all counts of the indictment," he had only made arguments as to Counts I, II, and V. Guadarrama declined to present evidence in his own defense.

The jury returned a verdict of guilty on all charges. Guadarrama was sentenced to the statutory minimum of 180 months in prison, and timely filed a notice of appeal. He challenges the sufficiency of the evidence in support of the jury verdict on all counts of the Indictment other than Count II.

## III.

In order to preserve a claim of error for appeal, a defendant must move for a judgment of acquittal under Federal Rule of Criminal Procedure 29 at the close of the government's case-in-chief and at the close of evidence. *United States v. Dandy*, 998 F.2d 1344, 1356 (6th Cir. 1993). "Although specificity in a Rule 29 motion is not required, where the defendant makes a Rule 29

motion on specific grounds, all grounds not specified in the motion are waived." *United States v. Chance*, 306 F.3d 356, 369 (6th Cir. 2002). Here, Guadarrama's Rule 29 motion[1] raised specific claims of error regarding Counts I, II, and V only. A different standard of review therefore applies to issues not raised in the Rule 29 motion.[2]

We review the preserved claims of error on appeal (Counts I and V) under the standard announced in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Under the *Jackson* standard, Guadarrama has "a very heavy burden." *United States v. Chavis*, 296 F.3d 450, 455 (6th Cir. 2002) (citing *United States v. Tocco*, 200 F.3d 401, 424 (6th Cir. 2000)). We must uphold the jury verdict if, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original); *see also United States v. Beddow*, 883 F.2d 496, 501 (6th Cir. 1989).

Guadarrama's burden is even more demanding for his unpreserved claims of error on appeal (Counts IV, VI, VII, and VIII). We review those claims under the manifest-miscarriage-of-justice standard, and will "only reverse a conviction if the record is devoid of evidence pointing to guilt." *United States v. Carnes*, 309 F.3d 950, 956 (6th Cir. 2002) (citing *United States v. Abdullah*, 162 F.3d 897, 903 (6th Cir. 1998)); *see also United States v. Price*, 134 F.3d 340, 350 (6th Cir. 1998) (instructing that absent a proper Rule 29 motion, "appellate review is limited to determining whether there was a manifest miscarriage of justice" (citation and internal quotation marks omitted)).

---

[1] Guadarrama moved for acquittal following the close of the government's case-in-chief, which was also the close of all evidence in the case because Guadarrama declined to present evidence in his defense.

[2] Guadarrama also filed a Motion for New Trial based on a general sufficiency-of-the-evidence challenge pursuant to Federal Rule of Criminal Procedure 33. However, he has not raised this issue in his briefing and thus, it is waived. *Marks v. Newcourt Credit Grp., Inc.*, 342 F.3d 444, 462 (6th Cir. 2003) ("An appellant waives an issue when he fails to present it in his initial briefs before this court."); *see United States v. Anderson*, 695 F.3d 390, 402 (6th Cir. 2012).

**IV.**

**A.**

Guadarrama first challenges his conviction on Count V for possessing a firearm in furtherance of a drug trafficking offense. 18 U.S.C. § 924(c)(1)(A)(i). That section imposes an additional mandatory minimum five-year sentence, to be served consecutively to any other sentence imposed, for "any person who during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm . . . ." Guadarrama was convicted under the "in furtherance" prong.

In order for possession to be "in furtherance" of an offense "the weapon must promote or facilitate the crime." *United States v. Mackey*, 265 F.3d 457, 461 (6th Cir. 2001). That is to say, there must be a "specific nexus between the gun and the crime charged." *Id.* at 462. We consider a "non-exclusive list of six factors to help distinguish possession in furtherance of a crime from innocent possession . . . ." *United States v. Brown*, 732 F.3d 569, 576 (6th Cir. 2013) (citing *Mackey*, 264 F.3d at 462 (internal quotation marks omitted)).

First, we consider whether the firearm was "strategically located so that it is quickly and easily available for use." *Mackey*, 264 F.3d at 462. The evidence at trial reflected that the pistol was located in the closet along with packaged marijuana, digital scales, discarded marijuana shrink-wrapping, and $7,000 in cash (and additional marijuana and cash were found in the room itself). A reasonable jury could conclude that the pistol was in the closet to provide ready protection for the large amounts of drugs and cash that were also contained therein. *See United States v. Penney*, 576 F.3d 297, 315 (6th Cir. 2009) (finding, under the manifest-miscarriage-of-justice standard, that evidence of shotguns next to $1,300 in cash in a closet could support a

conclusion that the shotguns were strategically located); *see also United States v. Mendizabal*, 214 F. App'x 496, 501 (6th Cir. 2006) ("In this case, Mendizabal's [loaded] gun was found in a safe along with the conspiracy-linked cocaine, where it would have been very useful in protecting that cocaine.").

Second, we consider whether the gun was loaded. *Mackey*, 264 F.3d at 462. Here, the gun was not loaded. However, this does not make the jury's conviction on this count unreasonable, especially where the gun was located atop a box of the appropriate ammunition. *See United States v. Sales*, 247 F. App'x 730, 736 (6th Cir. 2007) (holding that the evidence was sufficient to support an "in furtherance" conviction where, in addition to loaded weapons, "[t]he .12 gauge shotgun, albeit unloaded, was in the kitchen near a bag of rifle ammunition and the refrigerator containing marijuana.").

Third, we consider the type of weapon. *Mackey*, 264 F.3d at 462. The weapon involved was a .25 caliber handgun. Agent Smith testified at trial that handguns would be preferable for a person engaged in drug trafficking.

Fourth, we consider the legality of the weapon's possession. *Id*. As a non-citizen who admitted to entering the United States unlawfully, it was illegal for Guadarrama to possess the handgun. 18 U.S.C. § 922(g)(5)(A).

Fifth, we consider the type of drug activity involved. *Mackey*, 264 F.3d at 462. The evidence of drug activity was substantial: the gun was found near a large amount of individually-packaged marijuana, which Guadarrama admitted to dealing.

Sixth, we consider the time and circumstances under which the firearm was found. *Id*. Here, agents discovered the gun and marijuana in Guadarrama's apartment, where one of the controlled buys had occurred (albeit in the kitchen rather than in the bedroom). *See United States*

*v. Swafford*, 385 F.3d 1026, 1029 (6th Cir. 2004) (holding that there was sufficient evidence in support of an "in furtherance" conviction where an agent had testified that the gun in question was commonly used by traffickers and "while the drugs were not found in the same room as the gun, the garage where they were found was easily accessible from the bedroom where Swafford and the gun were found"); *see also United States v. Couch*, 367 F.3d 557, 561 (6th Cir. 2004) (concluding that the evidence was sufficient to support an "in furtherance" conviction where "the police located an additional eleven guns in Couch's garage–the area where Couch's drug transactions were known to occur and where the officers located over 200 additional pills.").

Relying on *United States v. Leary*, 422 F. App'x 502 (6th Cir. 2011), Guadarrama argues that he did not have ready access to the closet and that it was merely a "storage space." But in *Leary*, the defendant had stored a relatively small quantity of crack cocaine (3.48 grams) in a bedroom closet alongside a duffel bag containing two unloaded guns and no ammunition. *Id.* at 511. We found that the evidence was insufficient to support an "in furtherance" conviction: the drug activity was not substantial because the quantity involved was "commonly in possession of both users and dealers," there was no evidence of drug sales in the apartment, agents did not find drug manufacturing equipment in the apartment, and the testimony regarding the type of weapon only served to establish a general nexus between weapons and drug trafficking. *Id.* at 511–13. This case, by contrast, involved a substantial quantity of drugs and drug-paraphernalia located near guns and ammunition in an apartment where drug sales had taken place.

Together, the *Mackey* factors support the jury's decision to convict Guadarrama of possessing a firearm "in furtherance" of a drug-trafficking crime. On this evidence, a rational trier of fact could find that Guadarrama possessed the handgun in furtherance of drug trafficking activities.

**B.**

Guadarrama next makes a two-pronged challenge to his conviction of Count I: conspiracy to distribute 100 kilograms or more of marijuana in violation of 21 U.S.C. §§ 841 and 846. He asserts that there was insufficient evidence of a conspiracy and that, if a conspiracy existed, the evidence did not show that it involved at least 100 kilograms of marijuana.

"To sustain a conviction under 21 U.S.C. § 846, the government must prove the existence of an agreement to violate the drug laws and that each conspirator knew of, intended to join, and participated in the conspiracy." *United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002) (citing *United States v. Avery*, 128 F.3d 966, 970 (6th Cir. 1997)). "A tacit or material understanding among parties to a conspiracy is sufficient to establish agreement. Agreement need not be proved with direct evidence; it can be inferred from circumstantial evidence reasonably interpreted as participation in a common plan." *United States v. Beals*, 698 F.3d 248, 259 (6th Cir. 2012) (citing *United States v. Warner*, 690 F.2d 545, 549 (6th Cir. 1982)).

Guadarrama argues that merely storing someone else's marijuana cannot establish a conspiracy. But there was sufficient evidence that Guadarrama participated in a conspiracy to distribute marijuana with Flaco. Guadarrama admitted that he knew about the large quantity of marijuana in his apartment and that the marijuana belonged to Flaco; that he agreed to store the marijuana for Flaco; that he sold some of the marijuana himself; and that he and Flaco stored cash from the drug sales in the bedroom. Moreover, there were scales and discarded marijuana packaging in the room. Providing a storage space for large quantities of illicit drugs and cash is an act of participation in a conspiracy to distribute those drugs. *See United States v. Valenzuela*, 88 F. App'x 909, 912 (6th Cir. 2004) ("Although [defendant] claims that he was not a participant in that conspiracy, the record is replete with testimony regarding his drug sales and his efforts to

advance the purposes of the conspiracy both by procuring drivers to transport the marijuana from Arizona to Michigan and by arranging storage of the shipments upon their arrival."). Based on the evidence presented at trial, a rational trier of fact could conclude that Guadarrama conspired with Flaco to distribute marijuana.[3]

Guadarrama next argues that the evidence was not sufficient to establish that the quantity of marijuana involved in the offense was over 100 kilograms (approximately 220 pounds). Although he does not dispute that sixty pounds (just under twenty-seven kilograms) of marijuana were found in the apartment, he says that the Agents' estimates regarding the discarded shrink-wrapping were "too speculative" to give rise to an inference that the remaining 160 pounds (approximately seventy-three kilograms) existed.

We disagree. The jury saw pictures of the discarded shrink-wrap. An agent with over five years of drug-investigation experience testified that he had personally examined the wrappers, that they smelled of marijuana, had a green residue indicating recent use, and were consistent with the packaged bricks from the closet. Agent Coleman compared the discarded wrappers with the existing bricks and concluded that there were nineteen wrappers that held approximately ten pounds and five that held approximately one pound, for a total of 195 pounds, or 88 kilograms, of marijuana. Between the wrappers and the bricks that were recovered from the apartment, the government presented evidence of just over 115 kilograms of marijuana in the apartment. From this evidence, a reasonable jury could infer a quantity of over 100 kilograms.

## C.

Guadarrama's final claim of error is that the evidence was insufficient to establish that he knowingly possessed the handgun, shotgun, and ammunition within the meaning of

---

[3] The foregoing also disposes of Guadarrama's assertion, in a footnote, that his argument regarding possession should compel us to set aside his conviction in Count IV (possession with intent to distribute).

18 U.S.C. § 922(g)(5)(A) (Counts VI–VIII). We disagree. To prove a violation of 18 U.S.C. § 922(g)(5)(A), the government must show "(1) the defendant was an illegal alien, (2) who knowingly possessed a firearm, and (3) the firearm traveled in or affected interstate commerce." *United States v. Aleman-Ramos*, 155 F. App'x 845, 851 (6th Cir. 2005).

Possession under the statute "may be either actual or constructive and it need not be exclusive but may be joint." *United States v. Luna-Santillanes*, 554 F. App'x 402, 409 (6th Cir. 2014) (quoting *United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir. 1973), *abrogated on other grounds by Scarborough v. United States*, 431 U.S. 563, 97 S. Ct. 1963, 52 L. Ed. 2d 582 (1977)). Both actual and constructive possession "may be proved by direct or circumstantial evidence," *id*. (citing *Craven*, 478 F.2d at 1333); therefore, "we cannot overturn the jury's decision merely because it had to draw reasonable inferences to find [Guadarrama] guilty," *see United States v. Arnold*, 486 F.3d 177, 181 (6th Cir. 2007). "Constructive possession exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *Craven*, 478 F.2d at 1333 (citations omitted). "Proof that the person has dominion over the premises where the firearm is located is sufficient to establish constructive possession." *United States v. Kincaide*, 145 F.3d 771, 782 (6th Cir. 1998) (citation and internal quotation marks omitted).

Guadarrama urges us to reverse the jury's verdict as to his exercise of dominion and control over Bedroom Number 2 (and therefore his constructive possession of the pistol, shotgun, and ammunition) in light of his statements that another individual was renting the room. But Guadarrama merely rented out a room, rather than the entire apartment, and he stated that he still had access to the room. And Guadarrama's own statements indicate that he exercised

dominion and control over the room. Guadarrama claimed ownership of the handgun and some of the cash stored in the room. He also stated that he stored some of his personal items in the room. Finally, Guadarrama stated that the shotgun was his brother Alfredo's and that Alfredo had left it in the room when he was deported, which would allow a reasonable juror to infer that Guadarrama took possession of the shotgun. *See United States v. Williams*, 110 F. App'x 638, 642 (6th Cir. 2004) ("Having conceded that he borrowed the rifle from a friend (took possession of the rifle, in other words) and having admitted that he knew the rifle was on the premises, he indeed had the power and intention to exercise control over the rifle, either directly or through his girlfriend or son."). Indeed, "the most generous inference" in this case would be that Guadarrama possessed the shotgun jointly with Alfredo. *See United States v. Spencer*, 364 F. App'x 197, 200 (6th Cir. 2010).

Given this evidence, the record was not completely devoid of evidence pointing to Guadarrama's constructive possession of the firearms and ammunition.

## V.

For the foregoing reasons we AFFIRM Guadarrama's convictions.