UNITED STATES of America,
Plaintiff–Appellee,

v.

Aquil ALKUFI and Ibrahim Aoun,
Defendants–Appellants.

Nos. 14–1834, 14–2313.

United States Court of Appeals,
Sixth Circuit.

Feb. 1, 2016.

BEFORE: DAUGHTREY, ROGERS, and WHITE, Circuit Judges.

HELENE N. WHITE, Circuit Judge.

Following a jury trial, Defendants–Appellants Aquil Alkufi and Ibrahim Aoun were convicted of firearm and controlled substances offenses. The district court sentenced Alkufi to eighty-four months' imprisonment and Aoun to 360 months' imprisonment. Both Defendants appeal their convictions and sentences. We **AFFIRM** the convictions and Aoun's sentence and **VACATE** Alkufi's sentence and **REMAND** for resentencing.

## I. BACKGROUND

On January 25, 2013, Detroit police executed a search warrant at 6135 Stahelin Street (Stahelin House). Then–Sergeant Tharadrous White (White) had the first line of sight into the house during the search and immediately saw Aoun running "full strength" up the stairs carrying a green, cloth bag. (PID 573–74, 577.) Once police entered the house, they "cleared" the second floor, where they found Aoun. (PID 712–13.) Later, officers searched Aoun and found he had $660 in cash.

Officers later recovered a green lunch bag from a "crawl space" on the second floor of the house, which White identified as the bag he had seen Aoun carrying. (PID 585, 661.) The bag contained 1) a loaded Smith & Wesson .38–caliber revolver, 2) 393.5 pills marked "Watson 540," 3) 133 pills marked "Watson 853," 4) twelve pills marked "Watson 3203," and 5) two additional pills. Lab tests revealed all the pills marked "Watson" were dihydrocodeinone and one pill found was amphetamine. An officer testified that the quantity of pills found was consistent with distribution, and that "[t]he gun was inside the bag next to the pills possibly for protection," which was consistent with narcotics trafficking. (PID 706–07.)

In the downstairs, front bedroom, officers found 1) a loaded, semi-automatic handgun on the bed, 2) "numerous empty, plastic vials with white tops," and 3) a digital scale. (PID 625–26, 630.) Officers testified that the types of vials found were commonly used to package high-end marijuana and that they often found firearms inside the houses at which they executed search warrants for narcotics because drug traffickers often armed themselves to guard against robberies. No fingerprints were found on the firearms recovered at the Stahelin House.

Police found several other persons on the first floor of the house, including two women, three men, and a small child. Of-

ficers testified that they found no weapons or large sums of cash on any of these persons. Although no one present claimed the house as their residence, White testified that the house did not appear to be vacant. Police also found an "aggressive pit bull" locked in the basement, which Aoun said was his. (PID 715.)

Following the Stahelin House search, Detroit police involved the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) in the case and obtained an arrest warrant for Aoun on March 12, 2013. After an ATF source told him Aoun was at a house located at 6352 Auburn Street (Auburn House), agent Richard Jury (Jury) observed the location for about three hours. During that time, he saw sixty-eight vehicles arrive at the Auburn House, make contact with someone at the location, and depart within approximately thirty seconds to three minutes. He testified that in his experience, this was a "clear sign of narcotics trafficking." (PID 794.) Officer James Wiencek (Wiencek) also watched the house from about 10:00 or 10:30 PM until 1:00 AM and observed twenty-five or thirty persons arrive separately and either meet someone on the porch or go inside; they stayed for an "average of 45 seconds to two and a half minutes," which he testified was consistent with narcotics trafficking. (PID 958–59.) After Jury confirmed that Aoun was still there, police entered the house to arrest Aoun around 1:10 AM.

When police arrived, there were seven persons in or just outside the house; someone on the porch ran inside the house and officers followed him. Officers testified that the house appeared to be vacant—that is, it was in disrepair, there were very few pieces of furniture and they were in poor condition, the kitchen had no refrigerator or utilities, several of the kitchen cabinets had been ripped off, there

was no food, and there appeared to be no running water.

Two officers testified that they saw Aoun throw a plastic bag out a second-floor window. The bag was later found to contain multiple individual containers that collectively contained approximately forty-two grams of marijuana. In the room where officers found Aoun, they also found $962 in a hole in the wall.

Sergeant Jeffrey Pacholski (Pacholski) testified that when he reached the second floor of the Auburn House, he heard officers outside shouting, and then saw Alkufi "div[e]" back into the house through the window carrying a black grocery-style bag. (PID 870–72.) Inside the bag, officers found a loaded 9–millimeter Sig Sauer semi-automatic handgun, two loaded Ruger semi-automatic handguns, an unloaded .357 magnum revolver, two additional Ruger magazines, and a holster, in which one of the Rugers was found. When police searched Alkufi's person, they found a key to the front door and $526 in cash. Jury also testified that no one else present had a key to the house and that police found ten photographs of Alkufi in a bedroom on the second floor.

Officers testified that they found drugs in several rooms of the Auburn House and throughout the property. In the basement, they found a plastic bag containing over 600 pills in a number of pill bottles; some of the pills had markings such as "DAN 5513," "Watson 540," and "Watson 3202." Wiencek testified that the packaging and quantity of pills was "indicative of street-level sales." (PID 978–79.) Lab tests revealed these pills to be dihydrocodeinone (162 pills), amphetamine (52 pills), carisoprodol, or Soma (176 pills), and alprazolam, or Xanax (281 pills). Officers also found a one-gallon Ziploc bag in the mailbox "containing small plastic vials containing suspected marijuana," (PID 803,

898); they testified that the vials were similar to those they had seen used in drug sales in the neighborhood, and that the way the marijuana was packaged was consistent with distribution. In the kitchen, officers found a digital scale and a plastic vial containing marijuana. Jury testified that it was "extremely common" to find a digital scale "in proximity to the sale of narcotics," and that the vials were similar to those recovered at the Stahelin House. (PID 805, 809–10.) Officers also found a bag of marijuana on the living-room floor.

Police found additional firearms and ammunition at the house, including fifty .22–caliber rounds in the basement, a loaded 12–gauge shotgun in the yard, and another unloaded firearm that "look[ed] like a Tommy gun, assault rifle" in the backyard. (PID 926–28, 966–67.) No usable fingerprints were found on any of the firearms recovered at the Auburn House.

In addition to Alkufi and Aoun, there were five persons at the house when police arrived, including Durgham Alfadhili (Alfadhili), who was also present when police searched the Stahelin House. None of the other persons were found with illegal narcotics or firearms in their possession. Nobody in the house admitted living there. Officers found in the house a manila envelope with Alfadhili's medical records, as well as mail addressed to four persons who were not present.

Both Aoun and Alkufi were arrested at the Auburn House. Aoun was charged with: 1) one count of possession with intent to distribute controlled substances in violation of 21 U.S.C. §§ 841(a), (b)(1)(C), (b)(1)(E) (Count One, relating to the Stahelin House); 2) two counts of maintaining places for purposes of distributing controlled substances in violation of 21 U.S.C. § 856(a)(1) (Count Two for the Stahelin House and Count Six for the Auburn House); 3) two counts of felon in

possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (Count Three for the Stahelin House and Count Seven for the Auburn House); 4) two counts of possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A) (Count Four for the Stahelin House and Count Eight for the Auburn House); and 5) conspiracy to possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 841(a), (b)(1)(D), and 846 (Count 5, relating to the Auburn House). Counts Five, Six, and Eight also charged Alkufi. Several counts charged Alkufi and Aoun with aiding and abetting each other, including Count Six, maintaining a place (Auburn House) for the purpose of distributing controlled substances.

Alkufi spoke to police following his arrest. At trial, Jury testified that Alkufi told him that he sold pills, carried a gun for protection, and that one of the Rugers found at the Auburn House belonged to him. Jury also testified that Alkufi denied selling pills from the Auburn House and stated he never sold marijuana, but admitted selling pills from a Metro PCS store. When asked whether he had asked Alkufi about "any guns that were found in the house at 6352 Auburn Street that night," Jury replied, "Yes. Task Force Officer Wiencek asked Aquil Alkufi, stated to him that you guys have guns because selling drugs is dangerous, to protect yourself, protect the money, protect the drugs, and Aquil Alkufi said, yes, sir, and he also said that it's part of the game." (PID 818.)

The government also introduced evidence at trial about two incidents that occurred in April 2012. Officer Brian Headapohl (Headapohl) testified that on April 16, 2012, after receiving a "police run" that persons were selling narcotics, he and a partner went to a vacant house on Forrer Street (Forrer House), located

in the same neighborhood of Detroit as the Auburn and Stahelin Houses. (PID 750–52.) There, he found Aoun in a room upstairs, putting a bag into a vent in the floor. Another person was hiding in the closet. The bag contained what Headapohl suspected to be marijuana, twenty-two 500–milligram pills marked "Watson 540," and 162 325–milligram pills marked "Watson 538." Headapohl also found clear plastic vials with white caps, which looked like those found in the Stahelin House, and which were similar to those he had seen used to package marijuana in other narcotics-trafficking cases. Once at the police station, Headapohl recovered $437 from Aoun.

Later, Hopp testified that on April 11, 2012, he executed a search warrant at a house at 6797 Montrose (Montrose House), also in the same neighborhood of Detroit, where officers found six or seven men inside the house, including Alkufi and Aoun. In the living room, police found marijuana and a bag with approximately eleven pill bottles containing pills, and in one of the bedrooms they recovered "15 live 30/30 rifle rounds." (PID 932.) During the search, officers recovered $906 from Alkufi and $759 from Aoun. Hopp also recovered "[s]even clear plastic tubes with white tops" containing what he believed to be marijuana, weighing twenty-three grams, and a total of 566 pills, including 214 marked "DAN 5513," twenty marked "Watson 853," and 138 marked "Watson 503." (PID 983–85.) Hopp did not see Aoun in direct possession of either the drugs or ammunition at the Montrose House. Neither Alkufi nor Aoun was found in the room with the ammunition and no firearms were recovered at the house.

The jury found Aoun and Alkufi guilty on all counts. The court sentenced Alkufi to twenty-four months' imprisonment each

for conspiracy to possess with intent to distribute controlled substances and maintaining a place for the purpose of distributing controlled substances, to run concurrently, and to the sixty-month minimum for possession of a firearm in furtherance of drug trafficking in violation of § 924(c), to run consecutive to the other counts. The court sentenced Aoun to 360 months' imprisonment: sixty months and 300 months under § 924(c)'s consecutive mandatory minimums and one day and time served on all other counts.

## II. EVIDENTIARY CHALLENGES

We review the district court's evidentiary rulings for abuse of discretion. *United States v. Freeman*, 730 F.3d 590, 595 (6th Cir.2013). "An abuse of discretion occurs when a district court relies on clearly erroneous findings of fact, improperly applies the law or uses an erroneous legal standard." *United States v. Dixon*, 413 F.3d 540, 544 (6th Cir.2005). "[W]e will leave rulings about admissibility of evidence undisturbed unless we are left with the definite and firm conviction that the [district] court ... committed a clear error of judgment in the conclusion it reached." *United States v. Wagner*, 382 F.3d 598, 616 (6th Cir.2004). " 'Even when the district court has abused its discretion in admitting evidence, we do not reverse a conviction if the error is harmless.' " *Freeman*, 730 F.3d at 595 (quoting *United States v. Lopez–Medina*, 461 F.3d 724, 741 (6th Cir.2006)). To establish harmless error on a non-constitutional issue, "the government must show *by a preponderance of the evidence* that the error did not materially affect the verdict." *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir.2015).

### A. Evidence of Firearm Operability

■ Aoun argues the district court abused its discretion in prohibiting him

from introducing evidence that the .38 Smith & Wesson seized at the Stahelin House was inoperable. The district court excluded this evidence on the ground that operability of the firearm was not relevant. At trial, Aoun noted for the record that he had intended to introduce 1) a March 2013 government report indicating that the .38 Smith & Wesson was inoperable, 2) an examination of the gun by an ATF agent in February 2014 indicating that "after three tries of pulling back the hammer and pulling the trigger it was possible to cause the hammer to strike the mechanism to result in an explosion of the primer," and 3) testimony from a retired Michigan State Police firearms examiner, who had examined the gun and would testify that the gun had been altered, and that due to a defect, "it would be necessary to handle [it], at best, with two hands," to fire it. (PID 915–17.)

Aoun first argues that the question whether a weapon fits the legal definition of "firearm" is an issue of fact that the district court may not take away from the jury. The statute defines "firearm," in relevant part, as "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A). However, this Circuit has previously held that "a firearm need not be operable to satisfy the definition of firearm for purposes of 18 U.S.C. § 924(c)." *United States v. Bandy*, 239 F.3d 802, 805 (6th Cir.2001); *see also United States v. Mack*, 258 F.3d 548, 552 (6th Cir.2001); *United States v. Yannott*, 42 F.3d 999, 1006 (6th Cir.1994). Even if "the operation of a weapon may be relevant to whether it is designed to expel a projectile by the action of an explosive," *United States v. Counce*, 445 F.3d 1016, 1018 (8th Cir.2006) (per curiam), Aoun's evidence did not show that the .38 Smith & Wesson was not designed to operate as a

firearm, only that it did not perform that function well. Moreover, "[a] jury can reasonably conclude that a weapon is capable of firing a projectile, or at least that it had been designed for that purpose, where the jury has the actual weapon before it and there is testimony that the weapon was loaded when it was recovered by the police." *United States v. Morris*, 533 Fed. Appx. 538, 545 (6th Cir.2013) (citing *United States v. Forrest*, 402 F.3d 678, 686–87 (6th Cir.2005)). Thus, the district court did not err in excluding the evidence on this basis.

Next, Aoun argues that operability of the .38 Smith & Wesson is relevant to whether he possessed it in furtherance of drug trafficking in violation of § 924(c). To prove a violation of § 924(c), "and specifically the in furtherance element, the government must show a specific nexus between the gun and the crime charged." *United States v. Brown*, 732 F.3d 569, 576 (6th Cir.2013) (citation and internal quotation marks omitted). That is, the firearm must "advance, promote, or facilitate the crime." *United States v. Paige*, 470 F.3d 603, 609 (6th Cir.2006) (citation omitted). "To determine whether this specific nexus exists, we consider six factors—the *Mackey* factors—first adopted in *United States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001) ... to help distinguish possession in furtherance of a crime from 'innocent possession of a wall-mounted antique or an unloaded hunting rifle locked in a cupboard.'" *Brown*, 732 F.3d at 576 (citation omitted). First, "[i]n order for the possession to be in furtherance of a drug crime, the firearm must be strategically located so that it is quickly and easily available for use." *Mackey*, 265 F.3d at 462. "Other factors that may be relevant ... include whether the gun was loaded, the type of weapon, the legality of its possession, the type of drug activity conducted, and the

time and circumstances under which the firearm was found." *Id.*

Assuming, *arguendo,* that Aoun's evidence was relevant to whether he used the firearm in furtherance of drug trafficking and should have been admitted, any error in excluding this evidence was harmless. Aoun argues the exclusion materially affected the verdict because the government presented no direct evidence to support the § 924(c) charge and because the evidence would have shown the gun was so difficult to operate that he could not have used it in furtherance of a drug crime. Aoun relies on *United States v. Leary,* 422 Fed.Appx. 502, 511 (6th Cir.2011), where the court held that evidence that firearms were found in the same closet as drugs was insufficient to convict Leary of possessing a firearm in furtherance of drug trafficking. In *Leary,* however, the firearms were found in a duffel bag in the closet and were not "easily within [defendant's] reach." 422 Fed.Appx. at 513. Here, in contrast, the evidence strongly suggests the firearm was found in a crawl space because Aoun was able to quickly put it there when police arrived. Moreover, in *Leary,* there was little other evidence to support the charge, including no evidence of sale or manufacture of drugs within the apartment and a relatively small quantity of drugs. *See id.*

Here, there was ample evidence that Aoun possessed a firearm in furtherance of drug trafficking. White testified that when police arrived at the Stahelin House, he saw Aoun quickly run up the stairs with a bag, which was later found to contain the .38 Smith & Wesson, supporting that the firearm was located in a place where Aoun could easily access it. Moreover, Aoun's possession of the firearm was illegal and officers testified that the quantity of pills found in the bag with the firearm was consistent with distribution. Further, the firearm fit into what officers described as a lunch bag, suggesting it was a "small weapon that is easily transported or concealed on the body, making it more likely to be used 'in furtherance' of a drug crime than would be, for example, a rifle." *United States v. Gill,* 685 F.3d 606, 611 (6th Cir.2012). Other evidence that establishes a "specific nexus" was also present here— the firearm was found in close proximity to drugs and the cash on Aoun's person, *see United States v. Penney,* 576 F.3d 297, 315 (6th Cir.2009); the government introduced testimony that drug dealers "often carry guns to protect themselves and their drugs," *see United States v. Street,* 614 F.3d 228, 236 (6th Cir.2010); and Aoun was found in close proximity to the drugs, money, and firearm, *see United States v. Beals,* 698 F.3d 248, 270–71 (6th Cir.2012); *United States v. Whitehead,* 415 F.3d 583, 590 (6th Cir.2005). Although alone, the mere presence of a firearm where drugs are found or generalized testimony that drug traffickers often use firearms is not sufficient to establish a "specific nexus," *see Mackey,* 265 F.3d at 461; *see also United States v. Nance,* 40 Fed.Appx. 59, 67 (6th Cir.2002), harmless-error review requires the court to consider the evidence on the record as a whole, *United States v. Branham,* 97 F.3d 835, 851 (6th Cir.1996). Viewed in light of the record as a whole, the evidence Aoun wished to present would not have materially affected the verdict and therefore any error in its exclusion was harmless.

## B. Montrose House Evidence

Alkufi argues the district court abused its discretion in admitting testimony about the Montrose House that he contends was improper character evidence under Federal Rule.of Evidence 404. The government contends we should review Alkufi's challenge for plain error because Alkufi did not object to the evidence at trial. Be-

cause Alkufi's challenge fails under either standard, we need not decide whether he adequately preserved the issue for appeal.[1]

Federal Rule of Evidence 404(b) prohibits introduction of "[e]vidence of a crime, wrong, or other act ... to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed.R.Evid. 404(b)(1). However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* 404(b)(2). We use a three-tiered analysis to review evidentiary rulings in the 404(b) context:

> (1) we first review for clear error a district court's determination that the "other act" took place, (2) we then conduct a de novo review of the district court's legal determination that the evidence was admissible for a proper purpose, and (3) we review for abuse of discretion the district court's determination that the probative value of the other acts evidence is not substantially outweighed by its unfairly prejudicial effect.

*United States v. Perry,* 438 F.3d 642, 647 (6th Cir.2006) (citation and internal quotation marks omitted); *see also United States v. Olive,* 804 F.3d 747, 754 (6th Cir.2015); *United States v. Clay,* 667 F.3d 689, 694 (6th Cir.2012).[2]

**1. Evidence the Act Occurred**

First, we look to whether "there is sufficient evidence to support a finding by the jury that the defendant committed the similar act." *United States v. Yu Qin,* 688 F.3d 257, 262 (6th Cir.2012) (quoting *Huddleston v. United States,* 485 U.S. 681, 685, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988)). This requirement was satisfied by the testimony of two officers about the Montrose House incident. *See United States v. Sandoval,* 460 Fed.Appx. 552, 562 (6th Cir. 2012) (" '[T]he testimony of a single witness is sufficient for a reasonable jury to conclude that the defendant committed the prior acts.' ") (quoting *United States v. Johnson,* 458 Fed.Appx. 464, 470 (6th Cir. 2012)).

**2. Purpose of Evidence**

"In determining whether the proffered evidence is admissible for a legitimate purpose, it must be probative of a material issue other than character." *United States v. Hardy,* 643 F.3d 143, 150 (6th Cir.2011). This standard is met "if (1) the evidence is offered for a permissible purpose, (2) that purpose is in issue, and (3) if probative to the purpose for which it is offered." *Id.* at 150–51(citing *United States v. Jenkins,* 345 F.3d 928, 937 (6th Cir.2003)).

▮ The government introduced evidence about the Montrose House to show Alkufi's intent and plan, which is a permis-

---

1. Although Alkufi did not object at trial when this evidence was introduced, Aoun filed a motion in limine to exclude evidence about uncharged conduct (including the incidents at the Montrose and Forrer Houses) on the grounds the evidence violated Federal Rules of Evidence 403 and 404(b). Thus, the district court addressed this issue in ruling on Aoun's motion.

2. Although there is some disagreement in this Circuit about whether the three-tiered standard of review conflicts with the general use

of an abuse-of-discretion standard to review evidentiary rulings, *see Clay,* 667 F.3d at 694; *id.* at 702 (Kethledge, J., dissenting), we have noted that "the three-part test and the abuse of discretion standard 'are not in fact inconsistent, because it is [an] abuse of discretion to make errors of law or clear errors of factual determination.' " *United States v. Richardson,* 597 Fed.Appx. 328, 332 (6th Cir.2015) (quoting *United States v. Bell,* 516 F.3d 432, 443 (6th Cir.2008)).

sible purpose under Rule 404. Fed. R.Evid. 404(b)(2). Further, "where the crime charged is one requiring specific intent, the prosecutor may use 404(b) evidence to prove that the defendant acted with the specific intent." *United States v. Johnson,* 27 F.3d 1186, 1192 (6th Cir.1994); *see also United States v. Carter,* 779 F.3d 623, 625 (6th Cir.2015). Alkufi was charged with conspiracy to possess with intent to distribute controlled substances, which is a specific-intent crime. *United States v. Merriweather,* 78 F.3d 1070, 1078 (6th Cir.1996). This Circuit "has 'repeatedly recognized that prior drug-distribution evidence is admissible [under Rule 404(b)] to show intent to distribute.'" *Hardy,* 643 F.3d at 151 (citing cases); *see also Clay,* 667 F.3d at 695; *Bell,* 516 F.3d at 443.

Alkufi argues that his intent was not "in issue" because he admitted to selling pills at Metro PCS and only denied selling them at the Auburn House and in conspiracy with Aoun. However, this argument demonstrates that as to a conspiracy to distribute controlled substances at the Auburn House, Alkufi's intent was at issue. Further, where a defendant pleads not guilty to a charge requiring specific intent, "he put[s] his general intent and specific intent at issue," regardless whether he advances a defense on the issue of intent at trial. *See United States v. Lattner,* 385 F.3d 947, 957 (6th Cir.2004); *see also United States v. Jenkins,* 593 F.3d 480, 485 (6th Cir.2010). Thus, Alkufi's intent was "in issue" at trial.

We next consider whether the evidence offered was probative of intent, that is, "whether the evidence relates to conduct that is 'substantially similar and reasonably near in time' to the specific intent offense at issue." *Yu Qin,* 688 F.3d at 263 (quoting *United States v. Haywood,* 280 F.3d 715, 721 (6th Cir.2002)). To be probative of intent, the prior act need not "be identical in every detail" to the charged offense. *Perry,* 438 F.3d at 648 (citation and internal quotation marks omitted). However, in drug-distribution cases, this Circuit has "only found ... [past distribution] evidence probative of present intent ... when the prior [acts] were part of the same scheme or involved a similar *modus operandi* as the present offense." *See Carter,* 779 F.3d at 627 (quoting *Bell,* 516 F.3d at 443–44). "[T]o hold otherwise would be to 'employ[] the very kind of reasoning—i.e., once a drug dealer, always a drug dealer—which 404(b) excludes.'" *Id.* (quoting *Bell,* 516 F.3d at 443–44).

Relying on *Clay,* 667 F.3d at 689, Alkufi argues the Montrose House incident is too unrelated and far apart in time to be probative of his intent with respect to the Auburn House. However, Alkufi's reliance on *Clay* is misplaced. In *Clay,* this court held that evidence that defendant had assaulted someone in 2006 was inadmissible to prove intent to cause serious bodily harm to a different person in a 2007 carjacking because "[t]he two offenses at issue—assault and carjacking—are too unrelated and too far apart in time to be probative of whether Clay had the specific intent to do harm to [the victim]." 667 F.3d at 696. Here, the incidents at issue were closer in time and bear more similarity than did the offenses in *Clay.* In both incidents, Alkufi was found with a large amount of cash on his person in a house where a considerable quantity of drugs was recovered. Further, the offenses occurred in the same neighborhood and with some of the same people, including Aoun. The evidence is thus probative of whether Alkufi and Aoun intended to conspire to distribute controlled substances at the Auburn House.

### 3. Balancing Probative Purpose and Prejudicial Effect

Finally, we must decide whether the district court abused its discretion in deter-

mining that the prejudicial effect of this evidence did not outweigh its probative value. This court considers four factors when making this determination: "(1) whether other act evidence was unduly prejudicial; (2) the availability of other means of proof; (3) when the other acts occurred; and (4) whether the district court gave a limiting instruction." *United States v. Brown*, 147 F.3d 477, 483 (6th Cir.1998). "We grant the district court 'very broad' discretion in determining whether the danger of undue prejudice outweighs the probative value of the evidence." *United States v. Poulsen*, 655 F.3d 492, 509 (6th Cir.2011) (citation and internal quotation marks omitted); *see also Yu Qin*, 688 F.3d at 261.

Relying on *Jenkins*, 593 F.3d at 480, Alkufi argues that the similarity between the Montrose and Auburn House incidents renders this evidence "highly prejudicial." (*See* Alkufi Br. 20–21; Alkufi Reply Br. 3–4.) In *Jenkins*, the court held that evidence of defendant's eight-year-old conviction of possession with intent to distribute marijuana was inadmissible to show intent to distribute marijuana, crack cocaine, and powder cocaine in 2006 because its prejudicial effect outweighed its probative value. 593 F.3d at 484–86. There, however, the only similarity between the offenses was possession with intent to distribute marijuana and the location, and the court found the probative value of the evidence "microscopic at best" in light of the overwhelming other evidence of intent presented at trial, leading the court to conclude that this evidence was "merely·piling on." *See id.* at 484–86. Here, the incidents at the Montrose and Auburn Houses were more similar—that is, they occurred in the same neighborhood with some of the same persons and involved substantially similar circumstances—and are therefore more probative of a pattern or scheme. Additionally, although the Montrose House in-

cident occurred eleven months prior to the Auburn House search, this court has "previously held that evidence of an eight-year-old prior drug transaction is not too remote to be admitted as evidence of intent in a later drug trafficking prosecution." *United States v. Love*, 254 Fed.Appx. 511, 516 (6th Cir.2007) (citing *United States v. Matthews*, 440 F.3d 818, 830 (6th Cir.2006) and *United States v. Persinger*, 83 Fed. Appx. 55, 59 (6th Cir.2003)).

Alkufi also argues this evidence was prejudicial because the district court did not give a contemporaneous limiting instruction. However, Alkufi did not request a contemporaneous limiting instruction at trial. "The duty to provide an instruction ... arises only 'upon [the] request' of one of the parties." *United States v. Fraser*, 448 F.3d 833, 839 n. 3 (6th Cir.2006) (citation omitted). Indeed, we have previously held that a district court did not err where it did not provide a contemporaneous limiting instruction for 404(b) evidence, but later did so during the jury charge. *See United States· v. Waggoner*, 207 Fed.Appx. 576, 580 (6th Cir. 2006); *United States v. Johnson*, No. 98–3183, 2000 WL 712385, at *9 (6th Cir.2000). Here, the jury was instructed on the admissibility of "other acts" evidence the day before hearing testimony about the Montrose House incident. Although this limiting instruction was made specifically in reference to Aoun and the Forrer House incident, the jury was still instructed that it could only consider "other acts" as they related to defendant's intent or plan. Since the court again instructed the jury about this evidence during the jury charge—this time as to both defendants—the failure to give a contemporaneous limiting instruction does not render this evidence unduly prejudicial. Therefore, the district court did not err in admitting testimony about the Montrose House incident.

## III. CONFRONTATION CLAUSE CHALLENGE

This court generally reviews Confrontation Clause challenges de novo. *United States v. Ford,* 761 F.3d 641, 652 (6th Cir.2014). "However, when a defendant fails to object on Confrontation Clause grounds at trial, we review the claim for plain error." *Id.* (citing *United States v. Martinez,* 588 F.3d 301, 313 (6th Cir. 2009)); *see also United States v. Cromer,* 389 F.3d 662, 672 (6th Cir.2004). The government argues plain-error review applies because Aoun did not timely object at trial to testimony regarding Alkufi's statements. Aoun argues that he did timely object, and therefore a de novo standard of review applies. We need not resolve this issue because we find Aoun's claim fails under either standard.

The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. This includes the right to cross-examine witnesses regarding testimonial statements used against a defendant at trial. *See Crawford v. Washington,* 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Where defendants are tried jointly, the prosecution may introduce the statement of a nontestifying codefendant only against the defendant who made the statement and only where the statement does not "facially incriminate[ ]" the other defendant. *See Richardson v. Marsh,* 481 U.S. 200, 207–08, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); *United States v. Vasilakos,* 508 F.3d 401, 407 (6th Cir.2007). This principle stems from the Supreme Court's decision in *Bruton v. United States,* 391 U.S. 123, 124, 137, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), where it held that introduction into evidence of a nontestifying codefendant's confession that named Bruton violated Bruton's Sixth Amendment right to confrontation even

though the jury was instructed not to consider it as evidence against Bruton, observing, "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Id.* at 135, 88 S.Ct. 1620.

Aoun argues that Jury's testimony that "Wiencek asked Aquil Alkufi, stated to him that you guys have guns because selling drugs is dangerous, to protect yourself, protect the money, protect the drugs, and Aquil Alkufi said, yes, sir, and he also said that it's part of the game," violated his rights under the Confrontation Clause because, from the question asked, and in the context of evidence presented at trial, "you guys" could only be interpreted to include Aoun and Alkufi.

However, a nontestifying codefendant's statement must do more than incriminate by implication to violate the Confrontation Clause. Cases interpreting *Bruton* have found no Confrontation Clause violation where a nontestifying codefendant's statement is redacted to omit any reference to the defendant and implicates the defendant only when linked to other evidence presented at trial. *See Richardson,* 481 U.S. at 207–08, 107 S.Ct. 1702 (limiting *Bruton's* holding to situations where statement *facially incriminates* the other defendant, and not to those where a statement "became [incriminating] only when linked with evidence introduced later at trial"); *Ford,* 761 F.3d at 654; *United States v. Winston,* 55 Fed.Appx. 289, 293–95 (6th Cir.2003). Indeed, this Circuit has held that "introduction of a declarant-codefendant's self-incriminating, extra-judicial statement, in a joint trial, where the defendant's name is redacted and a neutral term is substituted, avoids any Sixth Amendment or *Bruton* violation." *Vasilakos,* 508 F.3d at 408.

Aoun relies on *United States v. Schwartz*, 541 F.3d 1331 (11th Cir.2008) and *United States v. Ramirez–Perez*, 166 F.3d 1106 (11th Cir.1999), for the proposition that a nontestifying codefendant's statement can violate the Confrontation Clause by "linking [the] defendant by implication." (Aoun Br. 24.) However, the statement at issue in *Schwartz* was more directly incriminating than the phrase "you guys," because it named a company of which Schwartz was President. *See Schwartz*, 541 F.3d at 1333, 1351. The court found the statement "powerfully incriminat[ing]" because it "compelled an inference that Schwartz directed [his company]" to take the actions mentioned in the statement. *See id.* at 1351. Moreover, the court observed that "[a]ny doubt that the limiting instructions were ineffective was erased when the prosecutor, in his closing argument, expressly linked Schwartz to the companies named in [the] statement."[3] *Id.* And *Ramirez–Perez* sheds no light on whether a *Bruton* violation occurred because there, the government conceded that there was a *Bruton* violation and the court therefore proceeded to determine whether the error was harmless. *See Ramirez–Perez*, 166 F.3d at 1109–10.

■ The law is clear that introduction into evidence of a nontestifying codefendant's statement does not violate the Confrontation Clause where it does not name the defendant, and implicates him *only* in light of other evidence presented at trial. *See Richardson*, 481 U.S. at 207–08, 107 S.Ct. 1702; *Ford*, 761 F.3d at 654. Although some redacted statements may still violate *Bruton* where the redactions make clear a specific name was omitted, *see Gray v. Maryland*, 523 U.S. 185, 188, 192, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998) ("Redactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration, ... leave statements that, considered as a class, so closely resemble *Bruton's* unredacted statements that ... the law must require the same result."), or where the statement itself contains information that makes it obvious any redacted name is the defendant's, *see United States v. Macias*, 387 F.3d 509, 519 (6th Cir.2004) (finding *Bruton* violation where redacted statement "referred directly to 'subject two,' who resides on Quest Drive"), neither is the case here. Alkufi's statement did not name Aoun directly, but implicated him by reference to other evidence from which the jury could infer that he was one of the "guys." In *Vasilakos*, we noted that because there were multiple codefendants, the statements did not necessarily incriminate a single codefendant. 508 F.3d at 408. Similarly, although Aoun was Alkufi's only codefendant, the jury heard testimony that five other persons were present at the Auburn House when police arrived. Moreover, the government did not attempt to use this statement against Aoun at trial. Thus, although Alkufi's statement implicates Aoun when considered with other evidence presented at trial, this is not a case where a codefendant's statement alone powerfully incriminates the defendant and cannot be cured by a jury instruction. Accordingly, the statement did not violate Aoun's Sixth Amendment rights.

## IV. SUFFICIENCY OF THE EVIDENCE

Alkufi argues the evidence was insufficient to convict him of any of the offenses.

---

**3.** Although Aoun argues the prosecutor in his case used Jury's testimony about Alkufi's statements against him in its closing argument, that claim is unsupported by the record.

Aoun challenges the sufficiency of the evidence for his convictions of maintaining a place for purposes of distributing controlled substances at the Stahelin and Auburn Houses. When reviewing a challenge to sufficiency of the evidence "we determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Russell*, 595 F.3d 633, 644 (6th Cir.2010) (quoting *United States v. Kone*, 307 F.3d 430, 433 (6th Cir.2002)). "This Court may reverse the jury's verdict only if it finds that the judgment is not supported by substantial and competent evidence, whether direct or wholly circumstantial, upon the record as a whole." *United States v. Hall*, 549 F.3d 1033, 1040 (6th Cir.2008).

### A. Alkufi: Conspiracy to Distribute Controlled Substances

To establish the elements of a conspiracy under 21 U.S.C. § 846, "the government must prove, beyond a reasonable doubt, (1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy." *United States v. Caver*, 470 F.3d 220, 232–33 (6th Cir.2006) (citation and internal quotation marks omitted). To show an agreement to violate drug laws, "the government need not prove the existence of a formal or express agreement among the conspirators. Even a tacit or mutual understanding among the conspirators is sufficient." *United States v. Gardner*, 488 F.3d 700, 710 (6th Cir.2007) (internal citation omitted). "Indeed, the existence of a conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in a common plan." *United States v. Wheaton*, 517 F.3d 350, 364 (6th Cir.2008) (citation and internal quotation marks omitted).

Alkufi argues there is insufficient evidence to prove he conspired to possess or distribute marijuana. However, the Second Superseding Indictment charged Alkufi with conspiracy to possess with intent to distribute marijuana *and* a number of other controlled substances that were found at the Auburn House. "It is settled law that an offense may be charged conjunctively in an indictment where a statute denounces the offense disjunctively. Upon the trial, the government may prove and the trial judge may instruct in the disjunctive form used in the statute." *United States v. McAuliffe*, 490 F.3d 526, 534 (6th Cir.2007) (citation and internal quotation marks omitted). The court instructed the jury in the disjunctive at trial. Alkufi further argues that negating his participation in a conspiracy to distribute marijuana affects the convictions because the government "used the marijuana to convict." (Alkufi Reply Br. 1.) However, the record does not support that the government used *only* marijuana to convict, or even that it focused on marijuana more than other controlled substances found at the Auburn House.

To the extent Alkufi intended to challenge his conviction of conspiracy to distribute controlled substances generally—rather than only with respect to marijuana—his claim still fails. Two officers testified that over the course of about 2 1/2 to 3 hours, activity consistent with drug trafficking occurred at the Auburn House. Once inside, officers found a large quantity of pills and marijuana, which they testified was consistent with distribution, as well as other indicia of trafficking such as vials and a digital scale. Further, officers found a key to the house in Alkufi's pocket and numerous photos of him in the house, which belies his claim that he was "merely present," and indeed suggests he knew

about and agreed to the trafficking. *See Wheaton,* 517 F.3d at 364 (finding evidence linking defendant to location where drugs were sold relevant to conspiracy charge). The jury also could have inferred participation from the fact that Alkufi was found with a bag of firearms at the Auburn House, and later admitted one of them was his and acknowledged to officers that using guns to protect drugs was "part of the game," which suggests he "took proactive steps to ensure the continued success of the conspiracy." *See United States v. Smith,* 609 Fed.Appx. 340, 344 (6th Cir. 2015).

Alkufi's argument that the government did not show he had a relationship, let alone agreement, with Aoun, is not supported by the record. Evidence showed Alkufi and Aoun had been found eleven months earlier in a house in the same neighborhood with a large quantity of drugs, where both were in possession of large sums of cash. Moreover, at the Auburn House, Alkufi was found in possession of $526 in cash, a bag of firearms, and a key to the house, all of which suggest he agreed to participate in drug trafficking at the house. Thus, there was sufficient evidence from which a jury could conclude beyond a reasonable doubt that Alkufi conspired to sell controlled substances at the Auburn House.

## B. Maintaining a Place for Purposes of Distributing Controlled Substances

Both Alkufi and Aoun challenge their convictions of maintaining a place for purposes of distributing controlled substances in violation of 21 U.S.C. § 856(a)(1). To prove a violation of this section, "the government must prove beyond a reasonable doubt that [a defendant] (1) knowingly, (2) maintained any place, whether permanently or temporarily, (3) for the purpose of

distributing a controlled substance." *Russell,* 595 F.3d at 644. In order to satisfy the purpose element, "the government need only prove that the defendant's drug-related purpose for maintaining a premises be 'significant or important.'" *Id.* at 643.

As to the "maintaining" element, "it is not necessary that the defendant lease or own the home." *Id.* at 644. "Acts that evidence 'maintenance' are 'such matters as control, duration, acquisition of the site, renting or furnishing the site, repairing the site, supervising, protecting, supplying food to those at the site, and continuity.'" *Id.* (quoting *United States v. Clavis,* 956 F.2d 1079, 1091 (11th Cir.1992)). "A variety of factual scenarios may amount to 'maintaining' a drug house under § 856(a), ... [including where a person] owns or rents premises, or exercises control over them, and for a sustained period of time, uses those premises to manufacture, store, or sell drugs, or directs others to those premises to obtain drugs." *United States v. Acosta,* 534 F.3d 574, 591 (7th Cir.2008) (citing cases). "[W]hether a defendant has 'maintained' a place is necessarily a fact-intensive issue that must be resolved on a case-by-case basis." *United States v. Payton,* 636 F.3d 1027, 1043–44 (8th Cir.2011) (quoting *United States v. Morgan,* 117 F.3d 849, 857 (5th Cir.1997)).

### 1. Aoun: Stahelin House

■ Aoun challenges only the second element, arguing that there was insufficient evidence to find him guilty of *maintaining* the Stahelin House because the evidence establishes only that he was present when officers searched the house.

The government offers the following from which the jury could have concluded that Aoun "maintained" the Stahelin House. First, although not dispositive, Aoun was present at the house during a search for narcotics, suggesting he had

some connection to the house. *See Russell,* 595 F.3d at 645. *But see Payton,* 636 F.3d at 1043 ("A defendant's mere presence during a police search of a residence is insufficient to sustain a conviction under § 856(a)(1)."). Additionally, Aoun possessed a firearm and had an "aggressive pit bull" in the basement, indicating he took steps to protect the house. *See Russell,* 595 F.3d at 645; *see also Clavis,* 956 F.2d at 1091. Moreover, he knew where a crawl space was located and had a dog in the basement, suggesting he was more than a "casual visitor." *See United States v. Verners,* 53 F.3d 291, 296 (10th Cir. 1995); *see also Morgan,* 117 F.3d at 856–57 (finding relevant that the defendant's personal items were found at the location and that he stored items in non-common areas of the house). Finally, when police arrived, Aoun ran with the pills and was the only person with a large sum of cash in his possession, suggesting he had a supervisory role in the drug distribution. *Russell,* 595 F.3d at 644; *Clavis,* 956 F.2d at 1091.

Relying on *Clavis,* 956 F.2d at 1090–91, Aoun contends that evidence that a defendant may have regularly used the premises as a site from which to distribute drugs is not sufficient to show that he "maintained" the house for that purpose. However, in *Clavis,* the court noted that individual acts of sale by co-conspirators *alone* were insufficient to support the "maintenance" element of § 856(a)(1). *See id.* at 1091. Although there was less evidence of sustained use in the instant case than in some others, there was evidence from which jurors could have concluded that Aoun's connection to the house was more substantial, including that he knew where a crawl space was located, had a dog in the basement, and appeared to be the only person in control of the drugs. Further, although sustained use is certainly an important factor, the statute states that the

place may be maintained "permanently or temporarily," 21 U.S.C. § 856(a)(1), and Aoun cites no authority—and we are aware of none—to support that there is a minimum amount of time a defendant must maintain a place in order to be convicted under this statute. Based on the record as a whole, a reasonable jury could have concluded beyond a reasonable doubt that Aoun "maintained" the Stahelin House for purposes of drug trafficking.

### 2. Auburn House

#### a. Alkufi

Alkufi argues that because the evidence is insufficient to prove he conspired to possess and distribute marijuana, it is also insufficient to sustain his conviction under § 856 for maintaining a place for purposes of distributing controlled substances, which is dependent on the underlying drug-trafficking conviction. Since his only argument is based on insufficient evidence to support the drug-trafficking conviction—for which we determined there was sufficient evidence—this claim must fail.

However, even if we construe Alkufi's argument to independently challenge this conviction, that claim would also fail. There was testimony that when police arrived at the Auburn House, Alkufi had a key to the front door, a bag containing four firearms, and $526 in cash, from which the jury could reasonably conclude that he knew about the drug activity occurring in the house. Moreover, Alkufi was the only person found with a key to the front door, and ten photos of him were found in the house, suggesting that he "maintained" the house. As to purpose, "the government need only prove that the defendant's drug-related purpose for maintaining a premises be 'significant or important.'" *Russell,* 595 F.3d at 643. Officers testified that they observed activity consis-

tent with drug trafficking at the house, and once inside found a large quantity of pills and marijuana, firearms, and indicia of drug sales. The officers also testified that the house appeared to be vacant, with no food or running water, and very little furniture—that is, it did not appear to have any other purpose. Based on this evidence, a reasonable jury could have concluded beyond a reasonable doubt that Alkufi maintained the Auburn House for purposes of drug trafficking.

### b. Aoun

The government argues that Aoun's conviction on Count Six—maintaining the Auburn House for purposes of distributing controlled substances—is adequately supported by evidence that he possessed marijuana there (and threw it out the window); he and the marijuana were in proximity to $962 in cash; and the pills in the basement "bore the same markings as the Vicodin pills recovered from his drug houses on Montrose, Forrer, and Stahelin." (Gov't Br. 14–15.) Although this provides little evidence that Aoun "maintained" the house, the jury was instructed that it could find Aoun guilty of aiding and abetting Alkufi in maintaining the house for purposes of distributing controlled substances. "In order to aid or abet another to commit a crime, a defendant must in some way associate himself with the venture such that his participation is intended to bring about the crime or make it succeed." *United States v. Clark,* 928 F.2d 733, 736 (6th Cir.1991). Under 18 U.S.C. § 2, "[a] defendant can be convicted as an aider and abettor without proof that he participated in each and every element of the offense." *Rosemond v. United States,* —— U.S. ——, 134 S.Ct. 1240, 1246, 188 L.Ed.2d 248 (2014) (quotation omitted). However, "an aiding and abetting conviction [also] requires ... a state of mind extending to the *entire crime*," not merely a "different or

lesser offense." *See id.* at 1248 (emphasis added).

As discussed, there was sufficient evidence that Alkufi maintained the Auburn House for purposes of drug trafficking. Although Aoun argues there was insufficient evidence that he engaged in drug trafficking in the house, the record reflects otherwise. More than one officer testified that he saw Aoun throw a plastic bag out a window, and that the bag was later found to contain individual plastic vials of marijuana that officers testified were consistent with drug trafficking. Further, Aoun was found in close proximity to $962 in cash, and the pills found in the basement were similar to those found at the Stahelin, Montrose, and Forrer Houses. Thus, the jury could have concluded that he participated in drug trafficking at the Auburn House.

As to whether Aoun intended to aid Alkufi in maintaining the house, the Supreme Court has "previously found [the] intent requirement satisfied when a person actively participates in a criminal venture with full knowledge of the circumstances constituting the charged offense." *Rosemond,* 134 S.Ct. at 1248–49. Thus, "for purposes of aiding and abetting law, a person who actively participates in a criminal scheme knowing its extent and character intends that scheme's commission." *Id.* at 1249. Here, a reasonable jury could have concluded from Aoun's presence in the house for several hours, participation in drug activity, and evidence that he had previously been found in a similar situation with Alkufi at the Montrose House that he had full knowledge of the scheme and intended to contribute to its success. Thus, there was sufficient evidence to support the conviction on the basis that Aoun aided and abetted Alkufi in maintaining the Au-

burn House for purposes of distributing controlled substances.

### C. Alkufi: Possession of a Firearm in Furtherance of Drug Trafficking

■ Alkufi next argues that the evidence was insufficient to show he possessed a firearm in furtherance of drug trafficking in violation of § 924(c).[4] The Second Superseding Indictment charged Alkufi with possession of a firearm in furtherance of, *inter alia,* maintaining a place for purposes of distributing controlled substances. As discussed, there is sufficient evidence to establish that Alkufi committed the underlying offense.

Alkufi contends that only his statement to Jury tied his firearms to a drug-trafficking offense, and because he admitted selling pills only at Metro PCS, there was no evidence connecting his firearm to drug trafficking. However, the record belies this claim. Alkufi was found in possession of four firearms, three of which were loaded, as well as $526 in cash, in a house where officers testified that drug activity was taking place and large quantities of pills and marijuana were found, along with other indicia of trafficking such as a digital scale and vials.

There was also sufficient evidence from which the jury could have concluded beyond a reasonable doubt that Alkufi possessed a firearm *in furtherance of* drug trafficking. As discussed *supra,* to prove a violation of § 924(c), "the government must show a specific nexus between the gun and the crime charged." *Brown,* 732

F.3d at 576. Factors bearing on this analysis include whether the firearm was strategically located, "whether the gun was loaded, the type of weapon, the legality of its possession, the type of drug activity conducted, and the time and circumstances under which the firearm was found." *Mackey,* 265 F.3d at 462. Jury testified that Alkufi admitted that he had a gun to protect himself, his drugs, and his money. The jury was not required to accept Alkufi's later qualification that he only sold pills from a different location. Moreover, Alkufi was found in possession of four firearms, three of which were loaded. Officers testified that the activity they observed at the house indicated drugs were being sold, and once inside they found large quantities of pills and marijuana and other indicia of drug trafficking. Thus, there was sufficient evidence for the jury to convict Alkufi of possession of a firearm in furtherance of a drug-trafficking crime.

## V. SENTENCING CHALLENGES

### A. Aoun

■ The district court sentenced to Aoun to 360 months' imprisonment based on consecutive mandatory minimum sentences for two violations of 18 U.S.C. § 924(c). *See* 18 U.S.C. §§ 924(c)(1)(A)(1), (c)(1)(C)(i), (c)(1)(D)(ii). Aoun argues these mandatory consecutive minimum sentences violate the separation-of-powers doctrine because they allow prosecutors— via their charging decisions—to determine the sentence, rather than judges. This Circuit has already rejected the arguments

---

4. Alkufi argues in his brief that the evidence is insufficient to show he possessed a firearm in furtherance of a marijuana-trafficking conspiracy. However, the Second Superseding Indictment did not charge Alkufi with possession of a firearm specifically in furtherance of a marijuana-trafficking conspiracy. Rather, it charged Alkufi with possession of a firearm in furtherance of either possession with intent to distribute a controlled substance or maintaining a place for the purpose of distributing controlled substances. Because Alkufi's arguments challenge the nexus between his firearm and any drug-trafficking offense, we address those arguments here.

Aoun now makes. In *United States v. Cecil*, 615 F.3d 678, 695–96 (6th Cir.2010), we held "the separation-of-powers doctrine provides no comfort for those seeking additional judicial discretion in the sentencing context" because "Congress has the power to define criminal punishments without giving the courts any sentencing discretion." *See also United States v. Odeneal*, 517 F.3d 406, 414 (6th Cir.2008) (rejecting argument "that a statutory mandatory sentence violates the separation of powers doctrine because mandatory minimums unconstitutionally shift sentencing discretion away from the courts to prosecutors"). More recently, this court also rejected a separation-of-powers challenge to *consecutive* mandatory minimum sentences under § 924(c). *United States v. Richardson*, 793 F.3d 612, 632 (6th Cir. 2015). Since the precedent established in these cases is binding on this panel, Aoun's challenge to his sentence fails.

**B. Alkufi**

Alkufi challenges the procedural reasonableness of his sentence. A sentence is procedurally erroneous when a district court "fails to calculate the Guidelines sentencing range, improperly applies the Guidelines or otherwise calculates the incorrect Guidelines sentencing range, treats the Guidelines as mandatory, fails to consider the [18 U.S.C.] § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails adequately to explain the chosen sentence." *United States v. Gar-*

*cia*, 758 F.3d 714, 724 (6th Cir.2014). "While the district court need not explicitly reference each of the section 3553(a) factors, there must still be sufficient evidence in the record to affirmatively demonstrate the court's consideration of them," *United States v. McBride*, 434 F.3d 470, 475 n. 3 (6th Cir.2006), and "[the court's] decision should be sufficiently detailed ... to permit meaningful appellate review," *Martinez*, 588 F.3d at 325 (citation and internal quotation marks omitted).

Alkufi did not object to the procedural reasonableness of his sentence before the district court. Although this would ordinarily subject Alkufi's claim to plain-error review, we review his sentence for abuse of discretion because the district court failed to ask the parties at the close of sentencing "whether they ha[d] any objections to the sentence just pronounced that ha[d] not previously been raised," in accordance with *United States v. Bostic*, 371 F.3d 865 (6th Cir.2004). *See United States v. Batti*, 631 F.3d 371, 379 n. 2 (6th Cir.2011).[5]

■ Alkufi argues his sentence is procedurally unreasonable because the district court failed to (1) calculate the Guidelines range, (2) make findings under § 3553(a), and (3) address Alkufi's mitigation arguments. The government concedes that Alkufi's sentence should be vacated and remanded for resentencing because the district court did not provide a sufficient explanation for the sentence pursuant to § 3553(a).[6]

---

5. The district court asked only "And do you have something you'd like to say?" which is not sufficient to meet the requirement under *Bostic*. *See Batti*, 631 F.3d at 379 n. 2 (holding that "[a]nything else concerning sentence?" was insufficient to meet the *Bostic* requirement).

6. The government does not concede Alkufi's other two arguments. As the government notes, Alkufi's first claim has no merit be-

cause the district court did calculate the Guidelines range by stating that it found the offense level, the criminal history category, and the calculation from the PSR accurate. Moreover, defense counsel explicitly acknowledged at the sentencing hearing that the presentence report scored the offenses for Counts Five and Six at 18 to 24 months and said it was "an appropriate scoring of the guideline." (PID 1177–78.) In his third argument, Alkufi lists issues he raised at sentencing that

342

## VI. CONCLUSION

For the foregoing reasons, we **AFFIRM** the convictions and Aoun's sentence and **VACATE** Alkufi's sentence and **RE-MAND** for resentencing.

the district court failed to consider as 1) severe mental handicap, 2) strong family support, and 3) peripheral role in the offense. The government contends Alkufi never argued to the district court that he had a peripheral role in the offense. However, Alkufi argued at sentencing that he was merely present at the house during the search. Thus, we do not agree that Alkufi failed to raise this challenge at sentencing.

