<u>NOT RECOMMENDED FOR FULL-TEXT PUBLICATION</u>
File Name: 19a0601n.06

Case No. 18-5471

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| THOMAS NATHANIEL ALLEN, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| MIKE PARRIS, | ) | TENNESSEE |
| | ) | |
| Respondent-Appellee. | ) | |

**FILED**
Dec 09, 2019
DEBORAH S. HUNT, Clerk

BEFORE: GUY, BUSH, and MURPHY, Circuit Judges.

**JOHN K. BUSH, Circuit Judge.** A jury convicted Thomas "Nat" Allen and two co-defendants of first-degree murder, and he sought a writ of habeas corpus under 28 U.S.C. § 2254. On appeal, Allen argues that the trial court violated his rights under the Confrontation Clause by failing to sever his trial from that of his co-defendants, whose redacted confessions were entered into evidence. Because Allen has not demonstrated that any alleged constitutional violation was prejudicial, we AFFIRM the district court's judgment denying habeas relief.

I.

Allen was convicted of first-degree murder for the 2003 murder of Don Wilder, Jr. Allen was tried and convicted with two codefendants, George "Lee" Smith and Shannon Jarnigan, Smith's girlfriend. The government never accused Allen of direct involvement in the murder; instead, the prosecution's case rested on the theory that Allen paid Smith and Jarnigan to kill

Wilder because Wilder was going to testify against Allen in an upcoming criminal trial. Both Smith and Jarnigan made statements to law enforcement about the crime. Smith provided law enforcement with a detailed confession describing how he invited Wilder to a hotel to use cocaine and then shot him in the back of the head. In the interview, Smith told police that he had received the murder weapon from Allen, who drove up in a green Suburban to drop the gun off and instruct Smith: "If you do it, get rid of the gun. I'll get you another one." S.R. at Page# 001717–18.[1] After making this confession to law enforcement, Smith agreed to wear a wire and provide law enforcement with a taped conversation between himself and Allen. The State referred to the statement in its closing argument. The State posited that venue was proper in Hamblen County because "[t]wo elements occurred here, premeditation and intent to kill intentionally . . . . He planned it here. He accepted the contract here." *Id.*, Page#1552–53. The prosecution went on to state that "[Smith] received the gun from the man driving the green Suburban [in Hamblen County]. We know that Nat Allen drove a green Suburban." *Id.*, Page# 1553.

Jarnigan also made a statement to police. It was not a full-throated confession, but she did offer details that supported the prosecution's theory of the case. She told law enforcement: "I heard rumors that there was a plan to kill [Wilder], because Don [Wilder] was a snitch on Nat Allen on some drug indictments." S.R., Page# 000094.

Smith and Jarnigan were indicted on July 5, 2005, and their case was set for trial November 28. Smith and Jarnigan were listed as codefendants at their first pretrial conference in August. Allen's presentment was issued July 5 (the same day as Smith's and Jarnigan's respective indictments), but he was not indicted until October 10.

---

[1] Citations to the State record are designated SR. Citations to the record in the federal proceedings are designated R.

The government filed a motion for joinder of the three trials, to which Allen objected. At the October 31 pretrial hearing, the court initially considered trying Allen separate from his codefendants because the government's introduction of Smith's and Jarnigan's respective statements against Allen threatened to create a Confrontation Clause violation under *Bruton v. United States*, 391 U.S. 123 (1968). Despite these concerns, the court determined that any potential Confrontation Clause issues could be ameliorated by redacting the statements. On February 15, 2006, Allen moved for a severance, arguing that the joint trial threatened his rights under the Confrontation Clause. The court denied the motion, and the three defendants jointly proceeded to trial.

At trial, the government introduced redacted versions of Smith's and Jarnigan's respective statements as well as the recorded conversations. Smith's original statement is replete with Nat Allen's name:

> I seen Nat the next day at my sister's house. Nat was driving a green Suburban. There was a white guy, about twenty-seven or twenty-eight years old, with him. Neither of them got out of the car. Nat was driving. Nat said they were on their way to play golf. Nat handed me something wrapped up in a newspaper. Nat told me, "I got something for you. When Sissy gets him off the hill, you shoot him." Nat said, "You get Sissy to drop you off somewhere or you get in the trunk, and then you shoot him." I asked Nat what about Sissy. Nat said, "Do her if you have to." I took the paper inside and looked at it. There was a black pistol wrapped up inside. It was an automatic. You load it by a clip inserted into the handle. It also had a laser sight on it. There was a button on the side of the handle that turned the laser on. I don't know what kind of gun it was. (I later shot it at my sister's house and discovered it was loaded.) I hid the gun in a closet and walked back outside to finish speaking with Nat. Nat told me, "If you do it, get rid of the gun. I'll get you another one." Nat and the guy left. I later showed the gun to my sister. I also fired the gun one night in the weeds in front of her house at what I thought was a prowler. My sister, Sissy, and a girl named Phyllis were there when I shot it. I shot it outside and didn't pick up the shell casing, which was thrown out the side of the weapon when I fired it.

S.R., Page# 000073.

3

The redacted version, which was read to the jury, states:

> [A]t my sister's house two men came by driving a green Suburban . . . . The driver handed me something wrapped in a newspaper and told me, "I got something for you. When he gets off the hill, you shoot him." . . . I took the paper inside and looked in it. There was a black pistol wrapped up inside . . . . I hid the gun in a closet and walked back outside to finish speaking to the person who had brought me the pistol. The driver said, "If you do it, get rid of the gun. I'll get you another one." I later showed the gun to my sister . . . . My sister and a girl named Phyllis were there when I shot it.

S.R., Page# 001717-18. This redacted proof was the only evidence introduced at trial suggesting that the murder weapon came from Allen.

The government also introduced Jarnigan's statement at trial. In the unredacted original, Jarnigan states: "I heard rumors that there was a plan to kill him, because Don was a snitch on Nat Allen on some drug indictments." *Id.*, Page# 000094. The redacted version, which was read to the jury, states: "I heard rumors that there was a plan to kill him because Don was a snitch." *Id.*, Page# 001805.

The taped conversation between Smith and Allen was also played for the jury unredacted. The conversation contained the following exchange:

> NA [Nathan Allen]: Okay I tell you that God damn cops are watching my house and fucking TBI
> NA: Everything
> LS [Lee Smith]: don't tell nobody shit
> NA: everybody in this town knows what the fuck done did and
> LS: don't come around, you got to understand that. I page you brother

S.R., Page# 001728.

None of the three defendants testified. Two times, the trial court instructed the jury that "[a]ny evidence which was limited to a particular defendant should not be considered by you as to any other defendant." S.R., Page# 000973, 001557.

In addition to Smith's and Jarnigan's respective statements, the State produced eyewitness testimony from four witnesses that Smith and Jarnigan received payment in exchange for killing Wilder because he was going to serve as a witness against Allen in an upcoming trial. One witness was Danielle Sissy Epps, who has a child with Wilder and was charged in this case as aiding and abetting in the murder. Her charge was reduced to attempting to facilitate first-degree murder pursuant to a plea deal. Epps testified that, at Allen's request, she induced Wilder to use drugs with her and recorded the conversation in an effort to provide Allen with proof that Wilder had served as an informant against Allen in relation to his drug charges. She also testified that when she met Smith, Nat introduced him as "the one that was going to take Don out." S.R., Page# 1214. She went on to describe a conversation in which Nat stated that "whoever got Don first would get paid." *Id.*, Page# 1215. She testified that she had seen Wilder, Allen, Smith, and Jarnigan on the day of the murder, and had been at the motel at which the murder occurred. She further testified that, in an effort to save Wilder's life, she made some attempts to convince him to leave the hotel room and return to their child, but stated that she did not pursue these efforts—or tell anyone else about the murder—out of fear for her own life.

A second witness, Robert Dewayne Rucker, was incarcerated at the time of trial. Rucker testified that he and Allen had discussed the possibility that Rucker would kill Wilder for twenty thousand dollars, but the plan ultimately fell through. *Id.*, Page# 001147–48. He also testified that Allen wanted to kill Wilder because Wilder had served as an informant against Allen, and that Allen had an indictment against him as a result.

A third witness was Allen's brother, Michael Lynn Brassfield, who was then serving a sentence on another crime and had accepted a plea deal to accessory after the fact in Wilder's murder. Brassfield testified that Allen told him there was a sum of twenty-five thousand dollars

"on Don Wilder's head," and that Allen promised that if "somebody took care of [Wilder] . . . [Allen] would make sure they got their money." *Id.*, Page# 1312. Brassfield also testified that shortly thereafter, Allen told him that Wilder had been killed and he was "giving Lee Smith money and dope." *Id.*, Page# 1313. However, according to Brassfield's testimony, Allen was not sure that Smith had actually gone through with the murder, so he asked Brassfield to go ask Smith to "see the body" for confirmation. *Id.* Brassfield testified that he then viewed and helped move Wilder's body to a different location, for which Allen paid him in drugs. According to Brassfield, he later delivered twenty thousand dollars' worth of money and drugs to Smith in two separate payments, after which Allen said they were "even." *Id.*, Page# 1316–17. Despite this, Brassfield testified, Smith repeatedly approached Allen requesting "more money for killing Don" and Allen ultimately "had to pull a gun on Lee" as a result. *Id.*, Page# 1341. Brassfield also testified that sometime after this, he and Allen got into a fight over a lawnmower which caused Allen to attack him with a baseball bat.

Kristopher Jarnigan, brother of codefendant Shannon Jarnigan, was a fourth witness. He testified that he drove Smith to Allen's house to "get crack cocaine that he was paying him for Don Wilder's murder," and that Allen gave Smith "two to three ounces of crack." *Id.*, Page# 1378–79. According to Kristopher Jarnigan, Smith told him he had shot Wilder in the back of the head and that Allen had already paid him ten thousand dollars. *Id.*, Page# 1379.

A jury found all three defendants guilty of first-degree murder. Allen was sentenced to life imprisonment.

Allen appealed to the Tennessee Court of Criminal Appeals raising eight arguments, including a challenge to the trial court's consolidation of his case with his codefendants as violating his rights under the Confrontation Clause. *State v. Smith*, No. E2006–00984–CCA–R3–CD, 2007

WL 4117603, at *15 (Tenn. Crim. App. Nov. 19, 2007). The Tennessee Criminal Court of Appeals affirmed the conviction, *id.* at *33, and the Tennessee Supreme Court denied permission to appeal.

Allen filed for post-conviction relief and a writ of error coram nobis in the Hamblen County Criminal Court, and his petition was denied. The denial was affirmed by the Tennessee Court of Criminal Appeals, and the Tennessee Supreme Court denied permission to appeal. *Allen v. State*, No. E2010-01971-CCA-R3-PC, 2012 WL 826522 (Tenn. Crim. App. March 13, 2012), *perm. app. denied* (Tenn. Oct. 1, 2012). Allen filed a petition to reopen post-conviction proceedings in the Hamblen County Criminal Court on the basis of ineffective assistance of post-conviction counsel, and the motion was denied. The Tennessee Court of Criminal Appeals denied permission to appeal.

Allen then filed a pro se petition for habeas corpus under § 2254 raising eleven grounds for relief. The district court denied the petition and declined to issue a certificate of appealability ("COA"). This court then granted a COA as to Allen's fourth claim: that the trial court's denial of his motion to sever his trial from that of his codefendants violated his Sixth Amendment right to confrontation.

II.

We review a district court's denial of a habeas petition de novo. *See Cleveland v. Bradshaw*, 693 F.3d 626, 631 (6th Cir. 2012). The district court's findings of fact are reviewed for clear error, and its legal conclusions on mixed questions of law and fact are reviewed de novo. *See Gumm v. Mitchell*, 775 F.3d 345, 359–60 (6th Cir. 2014). "[T]he habeas petitioner has the burden of rebutting, by clear and convincing evidence, the presumption that the state court's factual findings were correct." *Henley v. Bell*, 487 F.3d 379, 384 (6th Cir. 2007) (citing 28 U.S.C. § 2254(e)(1)) (other citations omitted).

Review of this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under AEDPA, if a state court has adjudicated the petitioner's claims on the merits, a writ of habeas corpus may not be granted unless the state court's adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"For purposes of 28 U.S.C. § 2254(d)(1), clearly established law as determined by [the Supreme] Court 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Yarborough v. Alvarado*, 541 U.S. 652, 660–61 (2004) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). A decision of the state court is an "unreasonable application" when "the state court identifies the correct governing legal rules from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Hill v. Hofbauer*, 337 F.3d 706, 711 (6th Cir. 2003) (quoting *Williams*, 529 U.S. at 407). A federal court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411.

Under this deferential standard, we do not ask "whether the state court's determination was incorrect, but rather whether fair-minded jurists could disagree about whether the state court's decision conflicts with existing Supreme Court caselaw." *Dewald v. Wriggelsworth*, 748 F.3d 295, 301 (6th Cir. 2014) (citing *Harrington v. Richter*, 562 U.S. 86, 101 (2011)).

III.

On appeal, Allen contends that his Sixth Amendment confrontation rights were violated when the trial court refused to sever his trial from that of his codefendants and subsequently introduced these three statements into evidence: (1) Jarnigan's statement to law enforcement about "rumors that there was a plan to kill [Wilder] because Don was a snitch"; (2) the unredacted taped conversation between Smith and Allen containing statements suggesting collective guilt; and (3) Smith's confession to law enforcement describing his receipt of the murder weapon from a driver of a green Suburban.

The Confrontation Clause of the Sixth Amendment, which applies to the States, guarantees "the right of a criminal defendant 'to be confronted with the witnesses against him,'" *Richardson v. Mash*, 481 U.S. 200, 206 (1987). This constitutional guarantee includes a right for the accused to cross-examine witnesses. *Id.* (citing *Pointer v. Texas*, 380 U.S. 400, 404 (1965)). Accordingly, in the case of a joint trial, a pretrial confession cannot be admitted against a codefendant "unless the confessing defendant takes the stand." *Id.*

A defendant has a constitutional right of cross-examination only for testimony "against" that defendant, which ordinarily would not include testimony that the court has instructed the jury not to consider against him. However, the Supreme Court has recognized that "where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial," there is a significant risk that the "jury will not, or cannot, follow [these] instructions." *Bruton v. United States*, 391 U.S. 123, 135–36 (1968). Accordingly, such an instruction will not obviate the need for cross-examination, and the confession of a non-testifying codefendant may only be admitted in a joint trial if it has been properly redacted to remove reference to the other defendants against whom it

may be incriminating. *See Cruz v. New York*, 481 U.S. 186, 193–94 (1987); *Bruton*, 391 U.S. at 136.

The Supreme Court has recognized that a proper redaction can cure a potential *Bruton* violation, and accordingly has held that a non-testifying codefendant's confession may be admissible in a joint trial if it is "not incriminating on its face, and bec[o]me[s] so only when linked with evidence introduced later at trial." *Richardson*, 481 U.S. at 208; *see United States v. Alkufi*, 636 F. App'x 323, 335 (6th Cir. 2016) ("The law is clear that introduction into evidence of a nontestifying codefendant's statement does not violate the Confrontation Clause where it does not name the defendant, and implicates him *only* in light of other evidence presented at trial.").

The Court also has clarified that "redactions that replace a proper name with an obvious blank, the word 'delete,' a symbol, or similarly notify the jury that a name has been deleted are similar enough to *Bruton*'s unredacted confessions as to warrant the same legal results." *Gray v. Maryland*, 523 U.S. 185, 195 (1998). Accordingly, a redacted statement identifying a defendant only inferentially may still run afoul of *Bruton* if it "involve[s] inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." *Id.* at 196. If so, we cannot assume the jury has obeyed the trial court's limiting instruction, and we must find a Confrontation Clause violation.

Here, the Tennessee Court of Criminal Appeals identified the applicable federal law from *Richardson*, stating that "the rule in *Bruton* does not apply to confessions that do not implicate the nonconfessing defendant and . . . *Bruton* does not apply to confessions from which all references to the nonconfessing defendant have been effectively deleted, provided that, as redacted, the confession will not prejudice the confessing defendant." *Smith*, 2007 WL 4117603, at *23 (citing *Richardson*, 481 U.S. at 200).

We must therefore consider whether the state court unreasonably applied this clearly established Federal law. Applying this authority, we now address the three sets of statements admitted into evidence that Allen argues violated his right of confrontation: (1) Jarnigan's statement to law enforcement; (2) the recorded conversation between Smith and Allen; and (3) Smith's statement to law enforcement.

A.      Jarnigan's Statement

Allen argues that Jarnigan's statement to law enforcement is "facially incriminating" because, given its reference to Don being a "snitch," "the jury would easily conclude that it refers to Mr. Allen." Petitioner Br. at 29. He also contends that because the statement earlier referenced Michael Bullington, the omission of any name draws attention to the fact that it was *not* referring to Bullington.

The Supreme Court has held that a nontestifying codefendant's confession is admissible in a joint trial when it is redacted to fully eliminate any reference to the other defendant. *See Richardson*, 481 U.S. at 208. Jarnigan's redacted statement contained nothing facially incriminating, no explicit reference to Allen, and nothing so obvious that it could refer only to him. Jarnigan's statement contained no reference to Allen, modified or otherwise. Indeed, the redacted statement reported that Jarnigan had "heard about a lot of people bragging that they killed [Wilder]." S.R., Page# 1805; *see* S.R., Page# 94.

Accordingly, the Tennessee Criminal Court of Appeals' holding as to Jarnigan's statement was not an unreasonable application of federal law.

B.      Recorded Conversation

As to the recorded conversation between Allen and Smith, Allen contends that the statement would indicate a co-conspirator relationship between them, and further argues that

11

confidential informant statements are "testimonial" under this court's precedent. Petitioner Br. at 32 (citing *United States v. Cromer*, 389 F.3d 662, 670–71 (6th Cir. 2004)).

Respondent replies that this argument is procedurally defaulted because Allen never raised this argument in state court.

Principles of comity require that we not seek to upset a state court conviction on the basis of an alleged constitutional violation that the state court never had an opportunity to correct. *See Rose v. Lundy*, 455 U.S. 509, 518 (1982). "Accordingly, we have required a state prisoner to present the state courts with the same claim he urges upon the federal courts." *Lyons v. Stovall*, 188 F.3d 327, 331–32 (6th Cir. 1999) (quoting *Picard v. Connor*, 404 U.S. 270, 276 (1971)). "[I]f an unexhausted claim would be procedurally barred under state law, that claim is procedurally defaulted for purposes of federal habeas review." *Awkal v. Mitchell*, 613 F.3d 629, 646 (6th Cir. 2010) (en banc) (quoting *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002)).

Allen never argued before the state courts that introduction of the recorded statement presented a *Bruton* violation. Instead, he argued that the failure to sever his trial was erroneous in light of Smith's and Jarnigan's respective statements to law enforcement. *See Smith*, 2007 WL 4117603, at *21–23. He did not challenge to the recorded conversation between himself and Smith.[2]

Allen contends that he raised his *Bruton* argument before the Tennessee Court of Criminal Appeals by arguing that the trial court erred in denying the motion to sever. We disagree. The "doctrine of exhaustion requires that the same claim under the same theory be presented to [the]

---

[2] Respondent suggests that Allen challenged this statement in his direct appeal on evidentiary grounds. However, the recording that was challenged in state court appears to have been a different conversation between Smith and Jarnigan, not the conversation between Smith and Allen at issue here. *See Smith*, 2007 WL 4117603, at *29–32.

state courts before raising it in a habeas petition." *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987) (citing *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987)).

Because Allen failed to raise this argument before the state court, we decline to address it on collateral review.

C.      Smith's Statement

Allen argues that Smith's statement to law enforcement violated *Bruton* because it used words like "man" and "driver" rather than neutral nouns.  He further argues that because the statement identifies other parties by name, the redaction of his name "raises suspicion that Smith was referring to a codefendant." Petitioner Br. at 27.  Finally, citing Sixth Circuit precedent, Allen argues that the confession is "incriminating on its face," *id.* at 28 (citing *United States v. Macias*, 387 F.3d 509, 519 (6th Cir. 2004)), because it refers to him as the "driver" of "a green Suburban," and other evidence introduced at trial established that he drove a green Suburban.

Respondent argues that the statement is not facially incriminating, does not contain obvious indications of alterations, and implicates Allen only when connected with other evidence presented at trial.

We need not determine, however, whether the Tennessee Court of Criminal Appeals' holding was an unreasonable application of Supreme Court precedent.  Even assuming the Confrontation Clause was violated by the admission of Smith's statement, Petitioner must also establish that he was prejudiced by the statement's admission to be entitled to habeas relief.  He has not done so.

"Confrontation Clause errors are subject to harmless-error analysis." *Gover v. Perry*, 698 F.3d 295, 302 (6th Cir. 2012) (quoting *Vasquez v. Jones*, 496 F.3d 564, 574 (6th Cir. 2007)).  To determine whether a Confrontation Clause error is harmless, this court uses the five *Van Arsdall*

factors: "(1) the importance of the witness' testimony in the prosecution's case, (2) whether the testimony was cumulative, (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, (4) the extent of cross-examination otherwise permitted, and (5) the overall strength of the prosecution's case." *Id.* (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) (internal quotations omitted).

Allen argues that the State's case against him was "anything but 'overwhelming,'" Reply Br. at 12 (quoting *Monachelli v. Warden, SCI Graterford*, 884 F.2d 749, 754 (3d Cir. 1989)), because the witnesses testified about events that occurred when they were on drugs, because they harbored bias against Allen, because there was no physical or documentary evidence linking Allen to the murder, and because one witness stated on cross-examination that Smith had confessed to killing Wilder for reasons unrelated to Allen.

We do not find these arguments persuasive. In *Monachelli*, the case upon which Allen relies, the improperly admitted testimony was by far the most compelling evidence against the defendant—a direct admission by the defendant that he had shot the victim. *See* 884 F.2d at 752. With that evidence excluded, the government's case rested solely on circumstantial evidence, including that the defendant "went to take target practice with a .22 caliber gun," that he had gone looking for the victim the night of the shooting, that he had been seen with a gun in his belt, and that he had told a friend he would kill the victim if he saw him. *Id.* at 753–54. The only other direct evidence was a witness who testified that she had heard the gunshot and then heard the voice of the defendant outside of her window. *Id.* at 754.

Unlike in *Monachelli*, in addition to Smith's statement, the State here introduced substantial direct testimonial evidence supporting its theory that Allen had paid Smith to commit the murder to prevent Wilder from testifying against him. Specifically, the State introduced direct

14

testimony from Danielle Sissy Epps, Robert Dewayne Rucker, Michael Brassfield (Allen's brother), and Kristopher Jarnigan (codefendant Jarnigan's brother). These four witnesses told a consistent version of events describing Allen's role in the murder, much of which was far more detailed and inculpatory than the testimony that he had delivered the gun to Smith. Each of them testified as to his or her awareness that Allen had offered money in exchange for murdering Wilder because of his intent to testify against Allen, or of direct knowledge that Smith had agreed to do so. Brassfield and Kristopher Jarnigan also testified to having participated in the crime in some capacity.

To be sure, Smith's statement was the only evidence allowing the jury to infer that Allen provided him with the murder weapon. But that does not demonstrate that the admission of the statement had a "substantial and injurious effect or influence in determining the jury's verdict," *Gover*, 698 F.3d at 303 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)), given the overwhelming properly admitted proof that supported the verdict. *See Stanford v. Parker*, 266 F.3d 442, 457 (6th Cir. 2001) (finding any error would be harmless in light of "[o]verwhelming evidence" of the defendants' guilt).[3]

IV.

For all these reasons, we AFFIRM the district court's judgment.

---

[3] We further reject Allen's argument that the statement was necessary to establish venue. "Proof of venue . . . is not an element of any offense and need only be proved by a preponderance of the evidence." *State v. Young*, 196 S.W.3d 85, 101 (Tenn. 2006) (citation omitted). Venue for premeditated murder is proper where the defendant "form[s] his intent to kill the victim." *Id.* at 102 (citing *Cagle v. State*, 507 S.W.2d 121,130–31 (Tenn. Crim. App. 1973)). While the State did reference Smith's statement in support of venue in closing, it also referenced other facts supporting venue, including that "[t]he premeditation took place here," "[Smith] planned [the murder] here," "[Smith] accepted the contract here," and "[Smith] test fired the gun." S.R., Page# 001553. Other evidence at trial similarly supported this finding, including but not limited to Allen's activities recording a conversation with Wilder to determine whether he was working with law enforcement. The Tennessee Court of Criminal Appeals similarly acknowledged the various facts supporting venue apart from the delivery of the gun. *See Smith*, 2007 WL 4117603, at *20. We accordingly find that Petitioner has not carried his burden to demonstrate that any error, if it occurred, was prejudicial.